Mark L. Grinsten v. Commissioner.
Grinsten v. Commissioner
Docket No. 93314.
United States Tax Court
T.C. Memo 1964-51; 1964 Tax Ct. Memo LEXIS 285; 23 T.C.M. (CCH) 390; T.C.M. (RIA) 640051; February 28, 1964
Val Linton, 1420 Foreman Bldg., Los Angeles, Calif., for the petitioner. Charles F. Quinlan, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioner's income tax for the years 1956, 1957, and 1958 in the amounts of $6,284.99, $373.75, and $301.43, respectively. Petitioner has agreed to certain of respondent's adjustments, included among which are those which account for the full amounts of the deficiencies determined for the years 1957 and 1958. The only issue remaining for our consideration is whether petitioner was entitled to recover the cost *286 of his interest in a note, which he purchased at a discount, before reporting as income any portion of the payments received on the note in excess of those representing interest at the rate specified on the face thereof. Some of the facts have been stipulated and are so found. Petitioner is an individual who during the years in question was a resident of Los Angeles, California. He filed his Federal income tax returns for said years, computed on the cash basis, with the district director of internal revenue at Los Angeles, California. On February 5, 1954, petitioner and Charles Linton (hereinafter referred to as Linton) purchased a note from the payee thereof at a discount. The background of this transaction and the facts respecting the security of petitioner and Linton for the payment of the note follow. On September 5, 1952, Irving J. Leff (hereinafter referred to as Leff), Maurice H. Friedman (hereinafter referred to as Friedman), and certain other individuals entered into an agreement to purchase certain improved real property located at 11th and Grand Streets in the City of Los Angeles (hereinafter sometimes referred to as the property). The agreement provided that the *287 property was to be leased to the State of California and that the parties would borrow or contribute whatever money might prove necessary to complete the extensive repairs and remodeling that would be required by such lease. On September 24, 1952, title to the property was taken, pursuant to the agreement, and initially held in the name of Samuel S. Slate, one of the purchasers. The total purchase price was $500,000, of which $300,000 was paid as a down payment. Of the $300,000 down payment, $75,000 was furnished by Leff and his wife, and another $75,000 by friedman and his wife. Each of these couples thereby acquired an undivided 25 percent interest in the property, and Leff, Friedman, and the other purchasers received deeds from Slate covering their undivided interests on June 8, 1953. Leff and Friedman each became entitled to 25 percent of the profits realized from the building. On September 29, 1952, the lease of the premises to the State of California was entered into between the State and Samuel S. Slate. The lease provided that the lessors were to complete certain alterations, repairs, and remodeling of the premises, and that the lease would be subordinated to any trust *288 deed put on the property. The five-year term of the lease was not to commence until said work was completed, and rental was to be payable, starting at such time, at the monthly rate of $20,648.45. The lessee was given an option to extend for an additional five-year term at a monthly rent of $17,552.41. On April 1, 1953, application was made to the Continental Assurance Company for a loan of $800,000 to be secured by the property. The company gave a commitment for a loan of that amount conditioned upon receipt by the lender of substantiation of the expenditure of $610,000 by the borrowers for the remodeling and alteration work, and of an appraisal by a competent local appraiser indicating a value of the premises of at least $1,200.000. The required appraisal was provided as of April 7, 1953. Assuming completion of the required alterations, the appraiser valued the property at $1,250,000. This figure was reached after a computation of reproduction cost and a computation of value based upon capitalization of anticipated income. The latter computation was based to a significant degree on an assumption that the State of California would exercise its option to extend the lease, and also *289 upon an assumption that the owners would be able readily to find other tenants if the State should vacate the premises after such time. The appraiser considered the lease to be fortuitous, both in terms of the rental to be paid and the degree of stability and reliability of the tenant. In June 1953, Leff and Friedman furnished the lender an affidavit to the effect that $612,668.77 had been spent in the alteration of the premises, and the loan was completed during that month. The loan was secured by a deed of trust of which the Continental Assurance Company was the beneficiary. The note called for interest to run at the rate of 4 1/2 percent, starting July 15, 1953, for the 12 1/2 year period of the loan. Payments (including accrued interest and principal) were to be made monthly in the amount of $10,450 for the first 5 years, commencing August 15, 1953. Thereafter the monthly payments were to be $3,933.60 until the loan was fully repaid on January 15, 1966. This payment schedule would result in between 60 and 70 percent of the loan being repaid in the first 5 years. Such an acceleration on the front end of a note is normally called for when there is an unusual risk involved. *290 The deed of trust provided, inter alia, that the holder of the note could require the trustors to maintain as much as $247,000 of rent-loss insurance. This amount approximately equalled the annual rent to be paid by the State of California for the period of its lease; it was also approximately the amount of principal that would remain due on the loan after the first 5 years, when the loan payments were to be reduced and the period of the lease ended. Part of the proceeds of the loan was used to pay the $200,000 balance due on the purchase price of the property, and the $600,000 remainder was applied to the expenditures for alteration and remodeling. Sometime between July 15, 1953, and the end of that year the State of California took possession of the property and the term of the lease commenced. On December 23, 1953, Leff and Friedman and their wives joined in the execution of a promissory note in the amount of $250,000 in favor of Leff's son Allen. As security, on the same day the makers executed a second deed of trust with respect to their total of an undivided one-half interest in the 11th and Grand property, together with the rents, issues, and profits thereof. The *291 note and second deed of trust were modified by an agreement between the parties thereto executed January 14, 1954. The agreement recited that $80,000 of the principal had been repaid to Allen, Leaving an obligation in the amount of $170,000 remaining. As modified, the note was to draw interest at the rate of 4 percent per annum. Payments (including interest to date and principal) were to be made on the 15th day of each month, in the amount of $3,000 per month beginning March 15, 1954, to and including May 15, 1955, and in the amount of $6,000 per month thereafter to and including February 15, 1957. On said last date the entire balance would become due. The usual rate of interest on second trust deed notes in the Los Angeles area during this period was 10 percent. Petitioner is an importer of furs. He has been acquainted with Linton since some time prior to World War II. Linton was a banker in Europe until he came to the United States in 1938 to live in New York. He and petitioner became involved in real estate transactions in New York at that time. For some years after the war they were associated in an import-export business in Japan, where petitioner was president and Linton *292 vice-president of the Asiatic Trading Company. Most of Linton's investments are in real estate. At the time he arrived in New York he found that many real estate first and second trust deeds were defaulted and selling at substantial discounts, and he purchased a number of these with petitioner. They still own certain of these as well as some more recently acquired real estate interests. Not all have turned out to be successful. In Los Angeles Linton became acquainted with the president of a mortgage company who knew the type of real estate investments that appealed to Linton. At the end of 1953 or early in January of 1954 this individual told Linton that a note in the amount of $170,000 secured by a second trust deed of a half interest in the property at 11th and Grand was available for $140,000. The deal sounded interesting enough to Linton that he asked two friends, one a former banking partner of his, if they would consider participating in it with him. Both turned it down. He then approached petitioner with the prospect, and petitioner decided to investigate the matter further with Linton. Petitioner was told at that time that others to whom Linton had offered a participation *293 in the deal had rejected it. Both petitioner and Linton, on whose judgment petitioner relied greatly in this as in other investment matters, were of the opinion that this transaction would be risky. One consideration bothering them was that the security for the note was subordinated to a first deed of trust securing a loan of a substantial amount in relation to the value of the property. If the deal turned sour and foreclosure was necessary, there would be a risk that Linton and petitioner would not recover their cost. Furthermore, the note was secured by only a second deed of trust of no more than an undivided half interest in the property. In the event of foreclosure petitioner and Linton would have to deal with the owners of the other half interest in the property, and they felt this could be a serious problem. In considering a real estate situation such as this, however, a factor more critical than the security is the income-producing character of the property, since it is income out of which the obligations initially would be expected to be paid. Petitioner and Linton gave more weight to this consideration than any other aspect of the deal, and upon analyzing Leff's and *294 Friedman's half interest in the cash receipts and expenditures they concluded that it was not clear that the full amount of the note could be paid out of income. The facts were that for the duration of the 5-year lease the total gross income from the property would be $20,648.45 per month. From this would have to be paid $10,450 on the first deed of trust, leaving a balance of approximately $10,200 per month. Additional monthly cash expenditures would be about $1,200 for real estate taxes, about $420 for insurance, and a minimum of $420 for upkeep and repairs. No services or utilities were to be furnished the State of California under the terms of the lease. Thus, the maximum net monthly cash income from the property would be about $8,160. Leff and Friedman would be entitled to half of this, or approximately $4,080 per month. As against this, the note offered to petitioner and Linton required payments of $3,000 per month from March 15, 1954 through May 15, 1955; thereafter, however, the payments were to be $6,000 per month. Petitioner and Linton visited Leff and Friedman at the office of one or both of the latter. Linton's opinion of them was favorable, and petitioner was impressed, *295 by the office and certain other factors, that the two had other means. They concluded that Leff and Friedman were rather clever investors, in part because it appeared that they had put less of their cash into the property than they had been able to borrow against their interests therein. Although they felt the situation involved risk, petitioner and Linton decided that the possibility of gain was worth the risk, and that they would proceed with the deal. The main factor in petitioner's decision was the favorable lease with the State of California. The transaction was closed on February 5, 1954. Petitioner furnished $70,000 of the $140,000 purchase price, thereby acquiring an undivided half interest in the note and second trust deed. Petitioner and Linton required a request for notice as to any defaults in payments to the holder of the first trust deed, as well as an agreement that Leff and Friedman would furnish monthly certified statements of an accountant as to the income and expenses of the property, as conditions to accepting the deal. This was because of their concern over the income situation and their belief as to the importance of seeing that all income attributable to *296 Leff and Friedman was properly applied and accounted for. For the same reason, petitioner told Linton's son, an attorney, to collect the payments on the note and in so doing to insist upon regular monthly payment. In addition, petitioner and Linton obtained affidavits from the Leffs, the Friedmans, and Allen Leff to the effect that the full $170,000 had been paid by Allen for the note. Soon after they purchased the note, petitioner and Linton learned that Leff and Friedman had an ownership interest in the New Frontier Hotel in Las Vegas. Leff and Friedman approached Linton and petitioner for a loan for the New Frontier Hotel. This request for funds was disconcerting to petitioner, and was turned down. A few months after their purchase of the note, petitioner and Linton heard widespread rumors that Leff and Friedman were having difficulties with the State of California in connection with another building. Quite a few months thereafter, in April 1955, they learned that suit had been filed by the State against Leff and Friedman. The suit, which was filed April 13, 1955, named as defendants Leff, Friedman, and another individual who had an interest in the 11th and Grand property, *297 as well as certain persons who did not. Samuel S. Slate was not a defendant in the suit. It alleged that the defendants had conspired to influence agents having responsibility for real estate transactions involving the State, and that as a result the State had leased, in 1949, and eventually purchased a certain parcel of real estate (other than 11th and Grand) from the defendants at inflated prices. Return of the rental and purchase price paid by the State, and any other just relief, was requested therein. This lawsuit was of great concern to petitioner and Linton. They wished at that point that they had not made the investment in question here. They were afraid the suit might mean that the State would not make its payments on the 11th and Grand property, and that if that happened the first trust deed would be foreclosed and they would be wiped out. They asked the individual who had initially informed Linton of the availability of the note to bail them out. He promised to do so, but the promise never materialized. Some slight delays were experienced in collecting the payments on the note from Leff and Friedman. With respect to the 33 payments due from March 15, 1954, to November 15, 1956, inclusive, *298 all but four were late. However, in only 11 months was full payment not made within 2 weeks of the date due, and all payments were made in full within 4 weeks of the respective due dates. One cable and 17 collection letters were sent to the debtors with respect to overdue payments. On November 21, 1956, petitioner and Linton assigned the note and second deed of trust to certain other parties for the sum of $31,137.82. Petitioner received half of this amount, or $15,568.91. At the time of the assignment, the sum of $31,610.38 was due from the makers of the note. The remaining payments were made in due course, the last being made on February 26, 1957. On his income tax returns for the years 1954, 1955, and 1956, petitioner treated the full amount of the excess of the payments received by him from the makers of the note over the interest called for on the face of the note as return of capital. Respondent determined that this method of accounting did not properly reflect petitioner's income, and that, pursuant to section 61 of the Internal Revenue Code of 1954, petitioner should have reported as income in respect of the discount three-seventeenths of such excess *299 of each such payment received. Accordingly, respondent made adjustments to petitioner's income taxes for the year 1956, pursuant to section 481 of the Internal Revenue Code of 1954, to correct for the effect of the use of petitioner's method of accounting in the years 1954, 1955, and 1956. Petitioner contends that his method of accounting for the discount, whereby no income in respect of the discount was to be reported before his cost had been recovered, was proper and should not be changed. [1] He relies primarily on our decision in Morton Liftin, 36 T.C. 909 (1961), affd. 317 F. 2d 234 (C.A. 4, 1963), to support the use of his method, sometimes called the deferred payment recovery of cost method, of accounting. Liftin involved a cash basis taxpayer who had purchased at discounts ranging up to 45 percent a large number of notes secured by second *300 deeds of trust on residential properties. The taxpayer had disposed of certain of these by methods which resulted in receipt by him of less than the face value of the notes. We found that his investments were speculative and that the amount of income he would receive in respect of the discounts was uncertain. In approving of his recovering his cost in each note before reporting any discount income therefrom, we said at p. 911: After a consideration of the cited cases and also of the general statutory provisions * * *, we conclude that a rule of law applicable to the instant case may be stated as follows: Where a taxpayer acquires at a discount contractual obligations calling for periodic payments of parts of the face amount of principal due, where the taxpayer's cost of such obligations is definitely ascertainable, and where there is no"doubt whether the [contracts] [will] be completely carried out" (Hatch v. Commissioner, * * * 190 F. 2d 254, reversing in part May D. Hatch, 14 T.C. 237), it is proper to allocate such payments, part to be considered as a return of cost and part to be considered as the receipt of discount income; but conversely, where *301 it is shown that the amount of realizable discount gain is uncertain or that there is "doubt whether the contract [will] be completely carried out," the payments should be considered as a return of cost until the full amount thereof has been recovered, and no allocation should be made as between such cost and discount income. The theory behind the rule enunciated in Liftin on which petitioner relies is, of course, that when it cannot be said with assurance that there will be any receipts in excess of cost, other than interest payments, or when the amount of such receipts (attributable to the discount) cannot be foretold with reasonable accuracy, income can be reflected most clearly by reporting no portion of periodic payments received as income attributable to the discount until after cost has been recovered. Cf. Burnet v. Logan, 283 U.S. 404, 412 (1931). We must take the "doubt" or "uncertainty" as to whether payments will be received in full, spoken of in Liftin, as having reference to a reasonable anticipation, based on the particular circumstances of a case, that such may not be received, rather than merely an awareness of the possibility of some unlikely theoretical *302 possibility that an otherwise expected payment in full might not be received. This must be the interpretation utilized if any cases are to be included in the first rule quoted above from Liftin. In terms of the language of Burnet v. Logan, supra, this is to say that we may determine tax liability on the basis of assumptions when those assumptions are merely the ordinary ones reasonable men must necessarily make in their everyday business affairs if commerce is not to cease entirely. Petitioner appears to agree with this when he asserts the reasonableness of his belief at the time he bought the note in question that his investment was risky. Unfortunately, however, petitioner has the burden of proof, and we cannot say on the basis of only those facts presented in this record that there was a reasonable doubt under the particular circumstances of this case whether payment would be made in full. One major portion of the evidence presented was directed to the question of whether petitioner's security interest in the property would be adequate to protect him in the event resort to it, and it alone, should become necessary. A showing was made that it was not entirely *303 clear whether such security would have been adequate in such event. However, as petitioner has insisted throughout and we have found as a fact in this case, a more important factor than adequacy of security in considering a loan of the type involved here is the question of whether the obligor's net income from the property securing the loan, after prior lienholders are provided for, will be sufficient for the payments required to be made to the owner of the obligation being analyzed. Petitioner has depended in substantial part on satisfying us that for the monthly payments of $6,000 due between June 15, 1955, and February 15, 1957, both inclusive, such monthly net income of just over $4,000 would not be sufficient. But such a showing does not seem determinative of even this one matter so heavily relied on by petitioner. We observe that at the time the note was purchased by him it appeared, from such facts as were presented in this record, that Leff's and Freidman's share of the net income from the property (after payment of fixed expenses including the amounts to be paid Continental Assurance Company) between June 15, 1955, and the expiration of the lease would be more than enough *304 to pay Linton and petitioner the total amount owed, with additional interest at the contracted rate on such late payments as might occur due to inability to pay more than $4,000 per month. The evidence presented by petitioner does not carry very far beyond these two considerations, however, and it does not establish certain of the facts we think must be shown in this case in order for petitioner to prevail. It seems to us that overriding both the questions of adequacy of security, and of the amount of income being produced by the property in relation to the size of the obligations secured thereby, may be such matters as the ability and willingness of the obligors to pay irrespective of such considerations. There is no evidence in the record whatsoever to indicate that Leff and Friedman and their wives were, or might have been expected to be, unable to make up from other funds at such times as necessary the difference between their $6,000 monthly obligations and the approximately $4,000 monthly income available from the property securing those payments. The amounts owed petitioner and Linton were personal obligations of the Leffs and Friedmans. The only evidence indicates that Leff *305 and Friedman appeared at the time of the purchase of the note to have substantial assets and to have been involved in a number of investment transactions, and that Linton and petitioner were impressed by them. Petitioner repeatedly asserts as the rule of general application for investing in this type of transaction, that one looks primarily to the sufficiency of income from the property. But we cannot conceive of a note with a favorable return being refused because of the amount of the income from the property securing such note, when there is no doubt that the borrowers have no need for that income in order to make the necessary payments required by the note. In this case it was petitioner's burden to show, at the very least, that the appearance that the borrowers had other property from which payments might be expected to be made was misleading. Petitioner has not done so. Likewise, there is nothing in the record from which we are able to find that it appeared likely the Leffs and Friedmans would not be desirous of making the required payments from other funds, when necessary, so as to protect their interest in the property. Petitioner contends that the debtors had little or *306 no equity in the property. But, in view of the rapid amortization of the first mortgage (occurring by virtue of the large monthly payments thereon during the first 5 years of that loan) we cannot find that the Leffs and Friedmans were not building an equity in the property which they would desire to protect from foreclosure by Linton and petitioner, even though payments from other sources were required. It is difficult to imagine that petitioner and Linton did not consider some or all of the factors we have mentioned here, for they did purchase the note without a discount of the size one would expect in a situation where the amount of payments that could reasonably be expected to be received was doubtful. The amount of the discount involved here, when combined with the interest called for by the note, gave them the possibility of a return only about 2 percentage points above the return that could be obtained on second trust deeds without discounts at the going rate of interest at the same time and place. This tends to indicate that the risk believed by petitioner to be incident to the situation in question here was not believed, at the time of the purchase, to be very different from *307 the risk involved in the average second trust deed. And merely the fact that there is evidence in the record indicating that regulated institutional investors were not apt to find second trust deeds attractive does not convince us that, on the average, notes secured by second trust deeds or second mortgages are so speculative that they can be said as a class to be of doubtful collectibility within the meaning of the Liftin holding. Petitioner also argues that subsequent to his purchase of the note certain occurrences made the doubtfulness of collection great enough to bring the holding in Liftin into play. Without intending to imply that facts learned or occurring subsequent to a taxpayer's entry into such a transaction may be used to determine that collectibility is uncertain, we state that we could not hold from such facts as appear in this record that payment in full became sufficiently less certain so as to dictate a result for petitioner. Petitioner testified that he became concerned when Leff and Friedman asked to borrow more money for use in the New Frontier Hotel in Las Vegas. Without knowing more, however, we cannot possibly say that the request for additional funds to *308 invest in that venture is either favorable or unfavorable to petitioner's cause. [2]
Petitioner and Linton both testified, and we have found, that they were very much worried about their investment when they learned of the suit against Leff, Friedman, and others brought by the State of California in regard to another piece of real estate. Petitioner argues that this made a similar suit with respect to the 11th and Grand property likely. There is nothing in the record to indicate that the dealings with the State concerning the property involved herein were in any way subject to the same type of accusations as were made in connection with the other, earlier transaction, however. Furthermore, from all that appears the State knew only of the interest of Samuel S. Slate in the property involved *309 in the instant case and since he was not shown to have been involved in the transaction sued upon, we have no reason to suppose the State would have re-examined the 11th and Grand transaction with suspicion after deciding there had been improprieties in the earlier one. We are unable to conclude on the basis of the record before us that it was doubtful whether petitioner would receive payment in full from the Leffs and Friedmans. Therefore, the Liftin rule, on which petitioner relies, is not applicable. The cases of Phillips v. Frank, 295 F. 2d 629 (C.A. 9, 1961), and Willhoit v. Commissioner, 308 F. 2d 259 (C.A. 9, 1962), reversing a Memorandum Opinion of this Court, both of which rely heavily on our opinion in Liftin, are distinguishable. The findings in those cases were that it could not reasonably be anticipated that the taxpayers involved would realize the profits hoped for. Their investments were found to be speculative. We cannot make such a finding here. Petitioner's discount here amounted to about 18 percent. In Darby Investment Corporation v. Commissioner, 315 F. 2d 551 (C.A. 6, 1963), affirming 37 T.C. 839, the discount *310 amounted to about 26 percent and other relevant factors indicated that the risk of nonrecovery of cost was even greater than in the instant case. The court, in holding for the Commissioner, aptly stated the rule, p. 552: The sole issue is whether the petitioner must include as income received with each monthly payment under the contracts, in addition to interest, realized discount income in proportion to the difference between the petitioner's cost and the principal balance due upon the face of such contracts at the date of their purchase. * * *
Determination of the issue turns on the question of whether the investment in the contracts is of such a speculative nature that the purchaser, the petitioner herein, cannot be reasonably certain of ever recovering his cost. Burnet, Commissioner of Internal Revenue v. Logan, 283 U.S. 404, * * * In our view, petitioner has not shown that he was not reasonably certain of ever recovering his cost. Therefore, Decision will be entered for the respondent. Footnotes
1. Petitioner raises no objection to respondent's computation of the adjustment to be made to income tax for 1956 to reflect the change in accounting method determined by respondent to be necessary; he contests only the determination that a change in accounting method was called for.↩
2. There is some evidence that the Las Vegas venture became involved in bankruptcy proceedings. But this evidence is so incomplete in terms of such details as when this may have occurred, the size of Leff's and Friedman's investment there as compared with their other assets, and the extent of exposure of Leff's and Friedman's other assets to liability, that it is of no probative value to us.↩