INTER-CITY TELEVISION FILM CORP., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 94696. Filed December 3, 1964.

*Maurice Austin* and *Morton A. Smith,* for the petitioner.
*John E. McDermott, Jr.,* and *Robert A. Trevisani,* for the respondent.

MULRONEY, *Judge:* Respondent determined deficiencies in the petitioner's income tax for the fiscal years ended February 28, 1955, February 29, 1956, and February 28, 1957, in the respective amounts of $218,251.67, $112,995.81, and $56,091.31. In an amendment to his answer the respondent claimed an increased deficiency for the fiscal year 1955 in the total amount of $366,137.59, and in a second amendment to his answer (filed after the trial) the respondent claimed an increased deficiency for the fiscal year 1955 in the total amount of $374,158.25.

The issues are (1) the determination of the correct basis to be used in amortizing television rights to certain motion-picture films and (2) the proper method of amortizing the cost of such rights.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Inter-City Television Film Corp., hereinafter called the petitioner, was incorporated under the laws of New York on March 16, 1954, with its principal place of business in New York City. Petitioner was engaged in the business of renting, through a distributor, motion-picture films for television exhibition purposes. Petitioner kept its books and filed its income tax returns on the basis of a fiscal year ending February 28 or 29. Petitioner filed its income tax returns for the fiscal years here involved with the district director of internal revenue in New York, N.Y.

U.S. Television Film Co., Inc. (hereinafter called USTV), was incorporated under the laws of New York on March 16, 1954, and owned all of the outstanding capital stock of petitioner from March 16, 1954, until the liquidation of both USTV and the petitioner on November 12, 1959. The capital stock of USTV was issued on March 17, 1954, as follows:

| | Number of shares |
|---|---|
| Joseph H. Seidelman | 330 |
| Emanuel P. Lewis | 165 |
| Herbert S. Silverman | 330 |
| Harry L. Goldstein | 340 |
| Saul S. Silverman | 330 |
| Jerome L. Greene | 495 |
| Irwin Margulies | 10 |
| Total | 2,000 |

Included among said shares were 10 shares each issued to Harry L. Goldstein and Irwin Margulies for services. The stockholders paid a total of $100,000 for the remaining 1,980 shares (about $50.50 per share). On or before March 23, 1954, the stockholders also loaned USTV the sum of $200,000.

Unity Television Corp. (hereinafter called Unity) was incorporated under the laws of New York on March 6, 1951, and until its liquidation in 1959 was engaged in the business of distributing, for its own account and for others, motion-picture films for television exhibition on a rental basis. Prior to March 23, 1954, the outstanding capital stock of Unity was owned by Arthur (or Archie) A. Mayers.

Major Attractions, Inc. (hereinafter called Major), and Arista Film Corp. (hereinafter called Arista) were New York corporations organized in 1951 and 1949, respectively. All of the stock in both corporations was owned on March 23, 1954, by Bertram A. Mayers.

The outstanding stock of Film Equities Corp., Standard Television Corp., General Television Corp., Nationwide Television Corp., Algonquin Associates, Inc., and Apollo Television Corp. was owned by one or more of the following group: Bertram A. Mayers, Arthur A. Mayers, Irvin Shapiro, or persons associated with them. Film Equities Corp. was liquidated in 1951 and its assets transferred to Film Owners, a partnership consisting of Arthur A. Mayers and Irvin Shapiro.

On March 23, 1954, the following transactions took place:

(a) Petitioner and Film Owners executed an agreement under which petitioner acquired the right to exhibit or license others to exhibit on television certain motion-picture films. Petitioner also acquired from Film Owners an account receivable of $208,567.51 which was due from Unity. The total purchase price stated in the agreement was $2,433,567.81, which petitioner on its books allocated to film rights in the amount of $2,225,000 and the remainder ($208,-567.81) to the account receivable. Petitioner paid $1,183,567.81 to Film Owners concurrently with the purchase and agreed to pay the balance of $1,250,000 (hereinafter sometimes called the deferred Inter-City obligation) in weekly amounts computed on the basis of a graduated scale of percentages, increasing from 5 percent to 60 percent of gross receipts as defined in the agreement. These payments were to begin, in any event, after the petitioner's gross receipts reached a total of $2,400,000, or they would begin sooner if the gross receipts reached certain lesser amounts by specified dates, as follows:

| Payments to begin when gross receipts exceeded— | If that happened prior to— |
| --- | --- |
| $1,900,000 | Mar. 1, 1955 |
| $2,025,000 | June 1, 1955 |
| $2,150,000 | Sept. 1, 1955 |
| $2,275,000 | Dec. 1, 1955 |

Petitioner agreed not to sell, mortgage, or pledge any of the film rights acquired under the agreement until it made full payment to Film Owners of the amounts required by the agreement.

(b) Petitioner purchased the rights to certain motion-picture negatives from General Television Corp. for $5,000. These rights to the negatives, together with the television rights to motion-picture films acquired above from Film Owners, will hereinafter be called Film Owners picture rights.

(c) USTV purchased from Bertram A. Mayers all of the capital stock of Major and Arista, among whose assets were the rights to exhibit or license others to exhibit certain motion-picture films (hereinafter called the Major-Arista picture rights). The total purchase price stated in the agreement was $500,000, of which $50,000 was payable concurrently with the purchase and $200,000 on June 1, 1955. Payments on the balance of $250,000 (hereinafter sometimes called the deferred USTV obligation) were to commence after payment had been made in full of the deferred Inter-City obligation of $1,250,000, and then were to be paid weekly on the same basis of graduated percentages of gross receipts that had been specified for the payment of the deferred Inter-City obligation.

Film owners and Bertram A. Mayers granted USTV the option under certain conditions, on or after March 1, 1955, to purchase the balances due them under the deferred Inter-City obligation and the deferred USTV obligations at varying prices based on varying percentages of the gross receipts for the preceding fiscal year as follows:

| If option exercised on— | Price, as a percentage of gross receipts of prior fiscal year— |
|---|---|
| Mar. 31, 1955 | 70 |
| Mar. 31, 1956 | 60 |
| Mar. 31, 1957, and each Mar. 31 thereafter | 50 |

The term "gross receipts" used in the agreements as a basis for determining the starting point of payments on the deferred Inter-City obligation and for computing the amounts of such payments and of the payments on the deferred USTV obligation was, generally, the consolidated gross revenue on a cash basis, of the consolidated group, less certain payments to producers or licensors outside the consolidated group. The term "consolidated group" was defined to include petitioner, its parent, subsidiaries, and affiliates, including Unity.

(d) USTV purchased from Arthur A. Mayers all of the capital stock of Unity for $20,000.

(e) Unity executed an employment agreement with Arthur A. Mayers for a period of 5 years as general manager for a compensation

equal to 2 percent of the gross receipts of Unity and its affiliates, with a minimum of $5,000 and a maximum of $52,000 per year. Under the agreement Arthur A. Mayers had the right to acquire television rights in motion-picture films, subject to giving Unity the right of first refusal on their distribution, and subject to the right of Unity and petitioner to participate to the extent of 50 percent in any such film rights acquisitions. Unity also executed an employment agreement with Irvin Shapiro for a period of 5 years, at a compensation of $12,000 per year, with provisions as to his acquisition of film rights, their distribution, and participation in such rights similar to the provisions in the agreement with Arthur A. Mayers.

Unity agreed with Arthur A. Mayers and Irvin Shapiro that the employment contracts could be terminated by either party on 5 days' notice in the event of full payment of the deferred Inter-City obligation and the deferred USTV obligation or of the exercise by USTV of the above-described option to purchase the balances due under said obligations.

(f) Unity acquired from Standard Television Corp. without monetary consideration all of Standard Television Corp.'s television rights to October 31, 1954, in certain motion-picture films produced by the J. Arthur Rank Organization (hereinafter called Rank pictures).

(g) Harry L. Goldstein purchased from Standard Television Corp. the television rights to the Rank pictures (which consisted of about 50 feature films) for the 3-year period from November 1, 1954, to October 31, 1957, which rights Standard Television Corp. had acquired under an extension agreement, hereinafter called the Rank extension agreement, on January 18, 1954, from an English company known as General Film Distributors, Ltd. Harry L. Goldstein agreed to pay Standard Television Corp. the sum of $65,000 and to assume that corporation's remaining indebtedness, then amounting to $100,000, to General Film Distributors, Ltd. On the same day, Harry L. Goldstein transferred the Rank extension agreement to Hemisphere Film Co., a partnership, the partners of which were Harry L. Goldstein and Jerome L. Greene.

On March 23, 1954, USTV liquidated Major and Arista. Apart from the Major-Arista picture rights, the total assets and liabilities of the two corporations immediately prior to liquidation were $188,104.94 (which included $172,626.52 as a receivable due from Unity) and $246,620.88, respectively, or an excess of total liabilities over total assets in the sum of $58,515.94. Immediately prior to liquidation, a consolidated balance sheet for Major and Arista showed the Major-Arista picture rights in the amount of $61,685.13.

On March 23, 1954, USTV sold the Major-Arista picture rights to petitioner, which agreed to pay USTV the sum of $311,895.06 and, in

addition, assumed the liabilities of Major and Arista in the amount of $246,620.88. Petitioner recorded on its books the amount of $311,895.06 as payable to USTV. In July 1955 petitioner paid $285,000 to USTV on account of this indebtedness, the balance remaining outstanding until the liquidation of USTV and petitioner in November 1959.

On October 25, 1954, petitioner purchased the Rank extension agreement from the partnership, Hemisphere Film Co., for $215,000 payable in installments from January 31, 1955, to January 31, 1956. On September 21, 1955, petitioner and Hemisphere Film Co. reduced the purchase price of $215,000 to $165,000. On June 6, 1956, by an agreement with J. Arthur Rank Film Distributors, Ltd. (formerly General Film Distributors, Ltd.), the cost of the Rank extension agreement was reduced by $7,000.

On March 14, 1955, petitioner acquired television rights in four motion-picture films (hereinafter called the Grand National film rights) at a cost of $3,492.19. These rights were to run until April 18, 1960.

On June 6, 1955, petitioner purchased from Algonquin Associates, Inc., television rights in certain motion-picture films (hereinafter called the Algonquin film rights) at a cost of $95,135.30, and purchased from Apollo Television Corp. television rights in certain motion-picture films (hereinafter called the Apollo film rights) at a cost of $23,289.24. Through Hemisphere Film Co., petitioner on the same date acquired from Standard Television Corp., without monetary consideration other than the assumption of the latter's obligations under the underlying license agreements, television rights in seven motion-picture films (hereinafter called the Standard Screen film rights).

The Film Owners picture rights consisted of television rights in a large assortment of films, including 122 feature films, 44 Westerns, about 22 serials, 128 cartoons, 11 "Chimp" comedies, and 480 miscellaneous short subjects. The television rights to the great bulk of these films had been originally acquired by Film Equities Corp. on March 9, 1946. The television rights to four of the feature films in the group expired in 1955, five of the feature films expired in 1958, three of the Westerns in 1959, and one feature film, eight Westerns, and two serials in 1960. The television rights of the remaining films in this group were held in perpetuity.

The Major-Arista picture rights consisted of television rights in various feature films (including English and Spanish feature films) and Westerns as follows: 18 feature films, 35 English feature films, 9 Spanish feature films, 28 Charlie Chan feature films, and 20 Westerns.

The television rights to the 18 feature films ran until October 1960, the 28 Charlie Chan feature films to April 1961, the 20 Westerns to June 1960, the 9 Spanish feature films to April 1961, 8 of the English feature films to March 1960, 24 of the English feature films to April 1958, 1 of the English feature films to December 1957, and 2 of the English feature films to February and June 1956, respectively.

The Algonquin film rights consisted of television rights in 12 feature films which ran until March 1959 and in 1 feature film in perpetuity. The Apollo film rights consisted of television rights in 26 short subject films adopted from the book "Crusade in Europe" by Dwight D. Eisenhower and in 26 other short subject films, all of which ran until November 1959. The Standard Seven film rights consisted of television rights in seven feature films. The rights to these films ran to various expiration dates from 1956 through 1960.

The acquisition by petitioner of the Film Owners picture rights, the Major-Arista picture rights, and the Rank extension agreement in 1954 was regarded by petitioner as a single, composite transaction and all of these films were licensed in packages which grouped together in varying ways the above films with other films acquired by petitioner. The Algonquin film rights and the Apollo film rights were acquired by petitioner in 1955 for the purpose of grouping these films with the other films being distributed for petitioner's account.

The gross receipts as defined in the contract with Film Owners reached $2,275,000 before December 1, 1955, namely, by October 28, 1955, and by the end of December 1955 the gross receipts had reached $2,400,000. Petitioner thereafter made payments on account of its deferred Inter-City obligation (which appeared on petitioner's books as a liability account until petitioner's liquidation in November 1959) as follows:

| For year ended— | Amount |
| --- | --- |
| Feb. 29, 1956 | $37, 916. 96 |
| Feb. 28, 1957 | 305, 421. 05 |
| Feb. 28, 1958 | 164, 050. 32 |
| Feb. 28, 1959 | 112, 165. 65 |
| Period ended July 31, 1959 | 44, 502. 69 |
| Total | 664, 056. 67 |

Commercial television was authorized in the United States in 1941, but because of the war the industry did not develop to a significant extent until 1945. Television broadcasting uses two bands of differing frequency ranges in the radio wave spectrum—the VHF (very high frequency) band and the UHF (ultrahigh frequency) band. By 1957 a total of 82 television channels had been authorized—12 in the

VHF band and 70 in the UHF band. In May 1955 the Federal Communications Commission (FCC) adopted an allocation plan under which the available VHF channels were assigned by metropolitan districts and stations, involving a possible total of 406 stations. Because of increasing need for additional stations, problems of interference among stations, and for other reasons, the FCC found it necessary to revise the entire allocation plan, and in September 1948 issued a freeze order on new or pending applications for station licenses. The order continued in effect until July 1952, and the revised allocation plan provided for 12 VHF channels and 70 UHF channels and made station assignments to various communities in the United States involving a possible total of 1,875 commercial stations of which 556 were VHF and 1,319 were UHF. The total number of commercial stations on the air in 1952 was 108, in 1954 the number reached 402 stations, and in each of the following years continued to increase until it reached 579 commercial stations in 1960. In the 4 years following 1952 a substantial percentage of the UHF stations that went on the air failed, and many of the remaining UHF stations were operating at losses and on the verge of closing operations. Receiving set incompatibility was a principal reason for the poor financial record of UHF stations.

Television programing by an affiliated television station consists of network programing, reruns of films made originally for theatrical exhibition consisting largely of feature films, reruns of films made originally for television exhibition, and live and film programs originated by the stations themselves. During the period here relevant feature films were not licensed [1] to networks for network programing, but were licensed directly to the individual stations. In the early days of television virtually all films programed by local stations were reruns of films originally produced for theater exhibition. By the end of 1956 the average station devoted about one-half of its total hours on the air to network programs.

A film exhibition contract with a television station usually involved a group of films and licensed the station, over periods generally from 3 to 7 years, to broadcast the films a specified number of times, or sometimes an unlimited number of times. An exhibition contract generally provided for payment of the film rentals on a monthly basis over the license period. An effort was generally made to first license the film or group of films in the larger metropolitan market areas which were usually serviced by several commercial television stations and where the film rentals were higher, and then to approach the lesser market areas. After an initial license period had expired, the film or group

---

[1] The films were generally licensed for television exhibition on a rental basis.

of films could be licensed in the same market area, at a substantially lower rental, for further television exhibition, or reruns. Licensing for reruns was generally possible only in the large metropolitan areas.

Prior to December 1955 most of the feature films available for licensing to television stations were produced prior to 1940. In December 1955 the major motion-picture studios began to release the portion of their feature film libraries hereinafter called the pre-1948 films with the release of over 700 films by one of the major studios, followed by the release during 1956 of over 2,600 pre-1948 films by four other major studios. Other major film studios released their pre-1948 films for television exhibition during 1957.

As to the post-1948 feature film libraries of the major studios it was necessary to meet certain obligations to unions and guilds prior to the release of the post-1948 film for television exhibition. Arrangements with the guilds and unions were concluded in 1960 and in that year major studios started to release their post-1948 films in volume.

From March 1951 to March 23, 1954, Unity, as distributor, licensed for television exhibition films and groups of films, the television rights to which were owned by Film Owners, Major, Arista, Nationwide Television Corp., and Standard Television Corp., or which were licensed directly to Unity, as distributor, by others. After March 23, 1954, Unity acted as distributor, for television exhibition purposes, of the films which petitioner had the right to exhibit or license others to exhibit on television on the basis of a distribution fee of 20 percent of gross billings up to November 1, 1954, and 25 percent thereafter. At the same time Unity acted as distributor for television purposes of films which others, or Unity itself, had the right to exhibit or license others to exhibit. Until the release for television exhibition in late 1955 and 1956 of feature film libraries of the major Hollywood film studios, Unity was the second largest distributor in the United States of feature films for television exhibition.

During the fiscal year ended February 28, 1954, Unity executed a large number of contracts with television stations for the rental of films involving expected film rentals totaling about $3,200,000. The unbilled portion of the film rental contracts held by Unity at March 1, 1954, was about $1,980,000. After March 23, 1954, the business of Unity, i.e., distributing for television the films for which petitioner owned the rights, as well as the other films being distributed by Unity, was under the management of Arthur A. Mayers.

As its regular method of accounting Unity recorded the monthly billings to television stations for the amounts of film rental payable by the station each month. In recording such billings Unity recorded as income the distribution fees to which it was entitled and recorded

the balance of the film rentals as liabilities to the owners of the film rights, including petitioner, for whose account Unity was acting as distributor. Petitioner recorded as income the amounts of monthly rental income thus credited to it by Unity.

Subsequent to March 23, 1954, a large number of the film exhibition contracts made by Unity with television stations, most of them UHF stations, were considered by Unity to be worthless, due primarily to the financial difficulties encountered by the UHF stations or to their failure to commence operations. By March 31, 1955, the unbilled balances of exhibition contracts which were considered worthless or were canceled totaled $467,770.62, and by July 31, 1955, an additional amount (about $300,000) of unbilled contracts was similarly regarded as worthless or was canceled. Unity continued to execute film exhibition contracts with television stations, and in the fiscal year ended February 28, 1955, executed such contracts in the amount of approximately $1,875,000.

Late in 1954 and early in 1955 discussions were held by Harry L. Goldstein and Jerome L. Greene with Arthur A. Mayers, Bertram A. Mayers, and Irvin Shapiro involving, among other matters, revision of the terms of the deferred Inter-City obligation and deferred USTV obligation, reduction of Unity's overhead, uncollectible accounts receivable, and a revision of the terms of the other obligations existing between the two groups.

Adonis Television Corp. (hereinafter called Adonis) was incorporated under the laws of New York on January 12, 1955, for a purpose not here relevant, and on May 31, 1955, the stock of Adonis was issued at $475 per share to the same individuals who were the stockholders of USTV as follows:

| Name | Shares | Cash paid |
|------|--------|-----------|
| Joseph H. Seidelman | 26½ | $12,500 |
| Herbert S. Silverman | 26½ | 12,500 |
| Saul S. Silverman | 26½ | 12,500 |
| Harry L. Goldstein | 47½ | 12,500 |
| Emanuel P. Lewis | 13½ | 6,250 |
| Jerome L. Greene | 39½ | 18,750 |
| Irwin Margulies | 21 | ----------- |
| Total | 200 | 75,000 |

Harry L. Goldstein and Irwin Margulies each delivered his note to Adonis in the amount of $10,000 for 21 shares. On June 2, 1955, the Adonis stockholders (with the exception of Irwin Margulies) loaned $25,000 to Adonis.

On June 6, 1955, there was a balance of $54,500 unpaid on the original $65,000 indebtedness of Harry L. Goldstein to Standard Television Corp., and the amount of $200,000 payable by USTV to Bertram A. Mayers on June 1, 1955, was unpaid. On or before June 6, 1955, Bertram A. Mayers assigned to Arthur A. Mayers and Irvin Shapiro his rights to receive the $200,000 as well as the deferred USTV obligation. On June 6, 1955, Adonis acquired from Film Owners the deferred Inter-City obligation for $82,338.63, acquired from Arthur A. Mayers and Irvin Shapiro the aforementioned $200,000 obligation of USTV for $200,000 and the deferred USTV obligation for $16,467.72, and acquired from Standard Television Corp. for $54,500 the indebtedness in that amount which Harry L. Goldstein owed to Standard Television Corp. On the same date the employment agreements of Unity with Arthur A. Mayers and Irvin Shapiro were canceled.

Adonis paid the above amounts, totaling $353,306.35, with $73,306.35 of its own funds and with the proceeds of a 30-day loan of $280,000 obtained on June 6, 1955, from Jones & Co. and a participating group of three other factoring companies. The participating group, controlled respectively by several stockholders of Adonis, participated to the extent of $220,000.

On July 5, 1955, Adonis received payments of $54,500 from Hemisphere Film Co. and $200,000 from USTV in payment of the obligations of the payors in these amounts which had been acquired by Adonis. On the same date Adonis repaid the 30-day loan of $280,000 with interest at 2 percent.

Rock Pictures, Inc., and Slate Pictures, Inc., were incorporated on September 28, 1955, and February 6, 1956, respectively, under the laws of New York, and all of the stock in both corporations was owned by Jerome Hyams and Robert Seidelman (son of Joseph H. Seidelman).

In October 1955 the stockholders of USTV and Adonis granted Joseph H. Seidelman an option to acquire the stock of the two corporations, and subsequently Joseph H. Seidelman assigned the option to Robert Seidelman, his son, and to Jerome Hyams, or to corporations controlled by them. On March 1, 1956, Slate Pictures, Inc., purchased all of the stock of USTV, and Rock Pictures, Inc., acquired all of the stock of Adonis. On April 1, 1956, Adonis was liquidated and its assets, subject to its liabilities, were distributed to Rock Pictures, Inc. On December 1, 1956, Rock Pictures, Inc., was liquidated and its assets, subject to its liabilities, were distributed to its stockholders Jerome Hyams and Robert Seidelman.

Jerome Hyams had formed Hugo Television Films, Inc., in 1951 to engage in the business of leasing feature films to television stations.

In January 1957 he became an executive of Screen Gems, Inc. At the time of trial Jerome Hyams was executive vice president, general manager, and director of Screen Gems, Inc., which among its other activities also distributes film to television stations.

On January 7, 1957, Jerome Hyams, Robert Seidelman, and several others agreed to sell to Screen Gems, Inc., their stock in Slate Pictures, Inc., the stock in Hugo Television Films, Inc., and the stock in other film-distributing and film-rights-owning corporations controlled by Joseph Hyams. On the same date Unity and Hugo Television Films, Inc., entered into film distribution agreements with Screen Gems, Inc., under which the latter corporation became the subdistributor of Unity and Hugo Television Films, Inc.

On or about September 18, 1959, Jerome Hyams and Robert Seidelman sold to Screen Gems, Inc., for $227,713.96 all of their stock in Slate Pictures, Inc., as well as all their right, title, and interest in the deferred Inter-City obligation and the deferred USTV obligation which they had received when Rock Pictures, Inc., had been liquidated in 1956. On or about November 12, 1959, Screen Gems, Inc., caused Slate Pictures, Inc., USTV, Unity, and the petitioner to be liquidated and their assets, subject to their liabilities, to be distributed to Screen Gems, Inc.

The total amounts of film rental income provided for in the exhibition contracts with television stations entered into by Unity, or by Screen Gems, Inc., as subdistributor for Unity, were as follows:

| For year ended— | Expected rentals |
|---|---|
| Feb. 29, 1956 | [1] $714,000.00 |
| Feb. 28, 1957 | 240,684.34 |
| Feb. 28, 1958 | 211,186.00 |
| Feb. 28, 1959 | 186,621.00 |

[1] Approximately.

Prior to March 1954 the total gross billings of Unity relating to Film Owners picture rights, Major-Arista picture rights, and Standard picture rights (Rank extension agreement) were about $751,000, $898,000, and $1,422,000 in the fiscal years ended February 29, 1952, February 28, 1953, and February 28, 1954, respectively.

In subsequent fiscal years the gross billings of film rentals by Unity, or by Screen Gems, Inc., as subdistributor for Unity, for films the rights to which were owned by the petitioner, were as follows:

Source of film rights

| Period | Total gross billings | Film Owners picture rights | Major-Arista picture rights | Standard picture rights (Rank extension agreement) | Standard picture rights | Apollo film rights | Algonquin film rights | Unallocated |
|---|---|---|---|---|---|---|---|---|
| Mar. 28, 1954 to Feb. 28, 1955 | $1,345,961.39 | $549,351.72 | $676,049.81 | $120,559.86 | | | | |
| Fiscal year ended Feb. 29, 1956 | 932,998.71 | 334,729.00 | 426,591.11 | 108,068.97 | $9,469.26 | $16,949.41 | $37,190.96 | |
| Fiscal year ended Feb. 28, 1957 | 577,435.51 | 246,171.09 | 214,107.08 | 45,675.60 | 9,056.07 | 16,790.59 | 45,200.24 | $434.84 |
| Fiscal year ended Feb. 28, 1958 | 308,517.81 | 160,284.51 | 82,495.87 | 12,286.14 | 2,513.15 | 5,499.08 | 58,843.54 | (13,404.48) |
| Fiscal year ended Feb. 28, 1959 | 186,736.33 | 128,986.72 | 38,420.24 | 873.20 | 1,138.82 | 1,660.84 | 15,616.81 | 39.70 |
| Mar. 1, 1959 to July 31, 1959 | 72,410.27 | 54,133.00 | 16,439.96 | 14.30 | 257.30 | 243.28 | 1,242.43 | 80.00 |

Unity showed cash receipts during the period March 1954 through July 1959 as follows:

| Fiscal year ended— | Amount |
|---|---|
| Feb. 28, 1955 | $1, 666, 451. 28 |
| Feb. 29, 1956 | 1, 099, 107. 54 |
| Feb. 28, 1957 | 625, 326. 20 |
| Feb. 28, 1958 | 330, 819. 47 |
| Feb. 28, 1959 | 198, 586. 49 |
| Period ended July 31, 1959 | 65, 484. 21 |

Except for taxable income (before net operating loss deduction) of $5,054.62 in the fiscal year ended February 28, 1959, Unity reported net operating losses for its fiscal years ended February 28, 1955 through 1958, and for the period from March 1, 1959, to November 12, 1959. The corporation income tax returns in evidence of USTV for the fiscal year ended February 28, 1955, and February 28, 1957 through 1959, as well as for the period March 1, 1959, to November 12, 1959, show no taxable income. It is stipulated that the return for the fiscal year ended February 29, 1956, is missing.

No dividends were ever declared by petitioner, Unity, USTV, Adonis, Slate Pictures, Inc., or Rock Pictures, Inc., during their existence.

Petitioner reported the following income (or loss) on its corporation income tax returns for the fiscal years 1955 through 1959 and for the period ended November 12, 1959, as follows:

| Fiscal year ended— | Gross income | Expenses other than amortization | Taxable income before amortization | Amortization deduction | Taxable income (or loss) |
|---|---|---|---|---|---|
| Feb. 28, 1955 | $1, 100, 028. 17 | $97, 787. 50 | $1, 002, 240. 67 | $1, 084, 581. 49 | ($82, 340. 82) |
| Feb. 29, 1956 | 694, 856. 37 | 31, 836. 19 | 663, 020. 18 | 689, 033. 42 | (26, 013. 24) |
| Feb. 28, 1957 | 423, 642. 10 | 31, 078. 64 | 392, 563. 46 | 414, 072. 03 | (21, 508. 57) |
| Feb. 28, 1958 | 233, 230. 99 | 53, 066. 63 | 180, 164. 36 | 198, 944. 97 | (18, 780. 61) |
| Feb. 28, 1959 | 139, 426. 43 | 11, 911. 51 | 127, 514. 92 | 128, 690. 47 | (1, 175. 55) |
| Period ending Nov. 12, 1959 | 56, 721. 43 | 31, 603. 18 | 25, 118. 25 | 54, 801. 01 | (29, 682. 76) |

Petitioner computed the amortization deductions for the fiscal years 1955 through 1959 in accordance with the so-called cost-recovery method, under which depreciation or amortization is taken in the amount of the net receipts from the depreciable or amortizable asset in question until the cost of the asset is recovered. Respondent determined that the amortization of the film rights should be computed on a straight-line basis and, accordingly, allowed amortization of such film rights in the fiscal years ended February 28 (or 29), 1955, 1956, and 1957, in the respective amounts of $559,471.64, $274,118.63, and $274,118.63. Respondent also computed the allowable amortization of the film rights under the straight-line method for the fiscal

years ended February 28, 1958 and 1959, in the respective amounts of $257,354.76 and $223,826.87.[2]

Respondent, in an amendment to his answer filed before the trial, claimed a total increased deficiency for 1955 in the amount of $366,137.59 (instead of $218,251.67) and alleged as follows:

7. (a). With respect to the taxable year 1955 the amortization of the right to exhibit the so-called "Film Owner" films on television should be computed on a basis of $975,000.00 resulting in an allowable deduction of $178,750.00 for eleven months.

(b). With respect to such taxable year the amortization of the rights to exhibit the so-called "Major & Arista" films on television should be computed on a basis of $308,565.95 resulting in an allowable deduction of $56,870.42 for eleven months.[3]

Respondent, in a second amendment to his answer filed after the trial, claimed a total increased deficiency for 1955 in the amount of $374,158.25 and alleged that "With respect to the taxable year ended February 28, 1955 the cost basis of the so-called 'Standard Contract' [Rank extension agreement] relating to the Rank films is $54,500 resulting in an allowable deduction under Section 167 of the Internal Revenue Code of 1954 of $13,941.84."

OPINION

The basic issue in the case is the proper amount of amortization deduction that should be allowed in each of the fiscal years before us for the petitioner's film rights. The parties are in dispute both as to the basis to be amortized and the method of amortization.

*I. Basis of the Film Rights*

Both parties seem to have experienced some difficulty in fixing some amount as the proper basis for these rights. We will not trace the changes in position made by the parties but will confine our discussion

---

[2] Respondent computed the amortization deductions on the basis of the following:

| Film rights | Date acquired | Cost—fiscal year ended Feb. 28, 1955 | Cost—fiscal years Feb. 29, 1956–Feb. 28, 1959 | Life |
|---|---|---|---|---|
| Major-Arista | Mar. 23, 1954 | $558,565.94 | [1] $266,467.72 | 5 years. |
| Film owners | Mar. 23, 1954 | 2,225,000.00 | [1] 1,057,338.63 | 5 years. |
| Rank extension agreement | Nov. 1, 1954 | 215,000.00 | [2] 158,000.00 | 3 years. |
| Apollo | Oct. 1, 1954 | 23,289.24 | 23,289.24 | 62 months. |
| Algonquin | Mar. 1, 1955 | 95,135.30 | 95,135.30 | 4 years. |

[1] Respondent explained that the acquisition of an outstanding liability at less than face value by Adonis Television Corp. was considered to be a reduction in purchase price within the meaning of sec. 1017 of the 1954 I.R.C.
[2] Similarly, respondent treated a forgiveness of indebtedness as a reduction in purchase price.

[3] On brief respondent corrected this amount of the Major-Arista basis from $308,565.95 to $308,515.94.

to the amounts which appear in their briefs. Petitioner contends that the proper basis of its film rights, before amortization, at February 28, 1955, February 29, 1956, and February 28, 1957, was as follows:

| Date | Film rights | Basis—exclusive of deferred Intsr-City obligations | Payment to date on deferred Inter-City obligations | Total basis before amortization |
|------|-------------|------|------|------|
| Feb. 28, 1955 | Film Owners | $980,000.00 | | |
| | Major-Arista | 558,565.94 | | |
| | Rank extension agreement | 215,000.00 | | |
| | Total | 1,753,565.94 | | $1,753,565.94 |
| Feb. 29, 1956 | Film Owners | 983,492.19 | $37,916.96 | |
| | Major-Arista | 558,565.94 | | |
| | Rank extension agreement | 158,000.00 | | |
| | Algonquin | 95,135.30 | | |
| | Apollo | 23,289.24 | | |
| | Total | 1,818,482.67 | 37,916.96 | 1,856,399.63 |
| Feb. 28, 1957 | Film Owners | 984,992.19 | 343,338.01 | |
| | Major-Arista | 558,565.94 | | |
| | Rank extension agreement | 158,000.00 | | |
| | Algonquin | 95,135.30 | | |
| | Apollo | 23,289.24 | | |
| | Total | 1,819,982.67 | 343,338.01 | 2,163,320.68 |

Respondent contends that the proper basis of the petitioner's film rights is as follows:

| Film rights | Basis |
|-------------|-------|
| Film Owners— | |
| Paid on Mar. 23, 1954 | $975,000.00 |
| Paid on June 6, 1955 | 82,338.63 |
| | $1,057,338.63 |
| Major-Arista— | |
| Paid on Mar. 23, 1954 | 308,515.94 |
| Paid on June 6, 1955 | 16,467.72 |
| | 324,983.66 |
| Rank extension agreement (films produced by Rank organization)—paid on Mar. 23, 1954 | 54,500.00 |
| Algonquin—paid on June 6, 1955 | 95,135.30 |
| Apollo—paid on June 6, 1955 | 23,289.24 |

In its fiscal years 1955 and 1956 petitioner acquired rights to exhibit or license others to exhibit certain motion-picture films on television. These film rights were acquired in five groups, and it is petitioner's cost of acquiring such rights which will provide the proper basis for their amortization. Sec. 167(g), sec. 1011, and sec. 1012, I.R.C. 1954. There is no dispute as to the cost basis of the Algonquin and Apollo film rights which were acquired in the fiscal year 1956. As to the rights which we have called the Rank extension agreement, petitioner contends on brief that the initial cost of acquiring such rights in the fiscal year 1955 was $215,000 and that price reductions negotiated with the vendors reduced this cost basis to $158,000 in a subsequent fiscal

year.  In his original brief the respondent contended that the cost basis of the Rank extension agreement was $54,500 but in a supplemental brief now maintains that the cost basis as of the fiscal year ended February 28, 1955,· was $158,000.  The only remaining difference, therefore, between the parties is whether the cost basis as of February 28, 1955, should be adjusted downward to reflect the price adjustment of the subsequent year.

We see no justification for respondent's approach.  When these rights were originally acquired in the fiscal year 1955 petitioner incurred a definite obligation to pay $215,000 in installments from January 31, 1955, to January 31, 1956.  The record clearly demonstrates that the price adjustment made by the parties took place some time after the close of the fiscal year 1955.  This price reduction will influence the amount of amortization to be deducted in subsequent fiscal years.  We find that as of the end of the fiscal year 1955 petitioner's cost basis for the Rank extension agreement was $215,000.

A dispute also exists as to the cost basis of the Major-Arista group of film rights.  Respondent in his statutory notice of deficiency determined that the cost basis of such rights was $558,565.94 as of the end of the fiscal year 1955 and that the basis of such rights was reduced to $266,467.72 for the fiscal year 1956 and the following fiscal years.  Respondent explained that the acquisition of a certain outstanding obligation (the deferred USTV obligation) by Adonis Television Corp. was considered to be a reduction in petitioner's cost basis within the meaning of section 1017 of the Internal Revenue Code of 1954.  In an amendment to his answer the respondent alleged that the cost basis of the Major-Arista rights as of the end of the fiscal year 1955 was $308,565.95 (later changed to $308,515.95) and that this basis was increased in the fiscal year 1956 by the amount of $16,467.72, which is the amount paid by Adonis Television Corp. when it acquired the deferred USTV obligation ($250,000) from Arthur A. Mayers and Irvin Shapiro.  Respondent has the burden of proof as to the new matter pleaded in his amended answer.

Petitioner's parent, USTV, purchased the stock of Major and Arista on March 23, 1954, for a total stated purchase price of $500,000, but $250,000 of this total price was payable only after certain contingencies were met.  USTV liquidated Major and Arista and then sold the Major-Arista film rights, which were received in liquidation from the two corporations, to petitioner.  Petitioner agreed to pay USTV the amount of $311,895.06 and also assumed the liabilities of Major and Arista in the amount of $246,620.88, or a total of $558,515.94.  This is the amount which petitioner claims as the cost basis of the Major-Arista rights.

Respondent makes a sweeping argument to the effect that the Greene-Goldstein group (which controlled directly or indirectly

USTV, petitioner, Unity, and Adonis) purchased all of the film rights here involved from another closely associated group, the Mayers-Shapiro group, in one overall transaction; that it was intended at all times that the film rights acquired from the Mayers-Shapiro group would ultimately go to petitioner; and that consequently we must ignore all intermediate steps and treat the petitioner as the real purchaser of the film rights directly from the Mayers-Shapiro group. In other words, respondent is urging upon us the substance-versus-form argument and cites, among other cases, *Gregory* v. *Helvering*, 293 U.S. 465.

We do not believe that the intermediate step in the acquisition of the Major-Arista film rights can be ignored. Nothing in the record indicates that such sale by USTV to petitioner was a sham, or so lacking in substance that we can ignore it for tax purposes. The mere fact that such sale occurred between affiliated corporations does not, in itself, call for a different result. Nor can we, under these facts, ignore the separate corporate existence of USTV, the petitioner's parent. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436.

Respondent is, in essence, remaking the transaction from the form in which the vendees chose to carry it out. But it is clear that a taxpayer may adopt any form of conducting his business affairs that he chooses and is not required to choose a form most advantageous to the revenue. *Sanford H. Hartman*, 43 T.C. 105.

We cannot say that respondent has met his burden of showing that the intermediate steps in the acquisition of the Major-Arista film rights were so lacking in substance that they can be ignored. We sustain petitioner as to the cost basis to be used in amortizing the Major-Arista film rights.

The dispute over the cost basis of the film rights acquired from Film Owners arises principally because of petitioner's method of handling the cancellation of the deferred Inter-City obligation. Here, the petitioner has the burden to show that the disputed transaction was not a mere artifice which we can ignore for tax purposes. Petitioner acquired these rights in March 1954 and the purchase agreement provided that petitioner would pay $1,250,000 only after the gross receipts of petitioner and its affiliates reached $2,400,000. Such a contingent obligation would clearly not be a part of the cost basis of the film rights as of the end of fiscal year 1955, nor does the petitioner so contend. However, the income from the rental of the film rights did not live up to expectations, due largely to unfavorable business trends in the industry, and from late in 1954 to early 1955 petitioner sought to revise the contractual arrangement for percentage payments of the contingent obligation. Harry L. Goldstein, an executive of petitioner and USTV, testified that in repeated meetings

with the vendors he expressed his "desire that there be a revision or reformation of the arrangements." The revision was handled in this manner: On May 31, 1955, the stock of Adonis (apparently an inactive corporation) was issued to the stockholders of USTV, the petitioner's parent, and on June 6, 1955, the contingent obligation of $1,250,000 was transferred by the vendors to Adonis for $82,338.63.

Petitioner argues that the continued existence of the contingent obligation of $1,250,000 was not affected by this transfer to Adonis; that the obligation was not thereby discharged or settled; that there was merely a substitution of creditors; that the payments of $37,916.96 and $343,338.01 made by petitioner to Adonis in the fiscal years 1956 and 1957, respectively, under the terms of the transferred obligation are to be included as a part of the cost basis of the Film Owners film rights.

Respondent views the Adonis purchase as nothing more than a settlement and discharge of the contingent obligation for $82,338.63, which amount he includes in the cost basis of the film rights held by petitioner. Respondent argues that the payments by petitioner to Adonis were nothing more than a nondeductible distribution of earnings.

We agree with respondent's interpretation of the Adonis transaction. If petitioner, after the protracted and difficult negotiations with the vendors, had itself settled the $1,250,000 obligation for $82,-338.63, it would undoubtedly have been nothing more than a settlement of a purchase obligation resulting in a reduced basis for the film rights. See *Hirsch* v. *Commissioner*, 115 F. 2d 656, and *Gehring Publishing Co.*, 1 T.C. 345, where it was held that a settlement of an outstanding obligation at a reduced amount resulted, not as income from the cancellation of an indebtedness, but in an adjustment of cost basis. Such a result would probably be even more certain where the obligation being settled is contingent in nature. But by means of the Adonis device, petitioner seeks to give the obligation an appearance of continuing validity so that petitioner, without suffering any real economic loss, would be able to reduce its taxable earnings through substantial amortization deductions. In other words, petitioner would have the benefit of a drastically reduced purchase obligation (as far as the vendors of the film rights are concerned) and at the same time keep the original cost basis unchanged.[4] Petitioner has not suggested any valid business reason for this Adonis transaction. We consider petitioner's argument that it was carried out only at the insistence of

---

[4] We have examined the cases cited by petitioner in support of the Adonis transaction and we believe they are distinguishable. In those cases the respondent, by ignoring bona fide transactions, sought to impute a taxable gain to the taxpayers as a result of the transactions in question. That is not the fact situation here. For example, see *Koppers Co.*, 2 T.C. 152.

the holders of the obligation as without any merit. We believe the present fact situation is governed by the principles enunciated by the Supreme Court in *Gregory* v. *Helvering, supra.* The Adonis transaction is a mere artifice completely lacking in substance and we believe it must be ignored for tax purposes. Petitioner has not met its burden of showing otherwise. We sustain respondent on this question.

Respondent concedes on brief that the amount of $3,492.19 paid by petitioner in March 1955 to acquire television rights to four films (Grand National film rights) is a "proper subject for depreciation." We are also convinced from the record that the amount of $5,000 paid by petitioner in March 1954 for certain film negatives was an integral part of the cost basis of the film rights acquired by petitioner from Film Owners. Respondent merely argues that this item appeared on petitioner's income tax returns as a nondepreciable asset, but we do not regard this as conclusive. Petitioner, however, has not met its burden of showing that the amount of $1,500 is a proper addition to the cost basis of its film rights in the fiscal year ended February 28, 1957. We are shown nothing more than a book entry, and petitioner admits on brief that "there is no other evidence in the record as to the details of this item."

## II. Method of Amortization of Film Rights

Petitioner argues that it is justified in amortizing its various film rights as a single unit under a cost-recovery method of amortization. Under this method petitioner claims that a reasonable allowance for the amortization of its film rights for the fiscal years ended February 28 or 29, 1955 through 1959, would be $1,096,452.73, $759,946.90, $306,921.05, $164,050.32, and $112,165.65. Petitioner computes these amounts of amortization by allocating to the fiscal year ended February 28, 1955, that proportion of the cost of its film rights as of that date, exclusive of the deferred Inter-City obligation, which the gross receipts of petitioner, its parent, subsidiaries, and affiliates, including Unity, bears to $2,400,000. (This latter figure—$2,400,000—represents the amount of gross receipts of the group which had to be reached before payments were to begin on the deferred Inter-City obligation.) For the fiscal year ended February 29, 1956, the petitioner merely takes the unamortized cost of the film rights as of that date, $722,029.94, and adds to that amount the payments made by petitioner on the deferred Inter-City obligation, $37,916.96, or a total amortization for fiscal year 1956 in the amount of $759,946.90. For the fiscal years ended February 28, 1957 through 1959, the amounts of amortization are essentially the payments made by petitioner on the deferred Inter-City obligation.

Respondent, on the other hand, contends that each of the five groups of film rights must be amortized separately, and that the amortization should be computed under a straight-line method over the average term of the contracts in each group of film rights, and in the case of the Film Owners picture rights (the bulk of which were held by petitioner in perpetuity) over a period of 5 years.[5] Based on a life of 5 years for the Major-Arista picture rights, 43 months for the Rank extension agreement (Rank film rights), 45 months for the Algonquin film rights, and 53 months for the Apollo film rights, respondent computed the following amounts as reasonable amortization deductions:

| Fiscal year ended— | Total film rights amortization |
| --- | --- |
| Feb. 28, 1955 | $249, 253. 07 |
| Feb. 29, 1956 | 313, 042. 44 |
| Feb. 28, 1957 | 326, 752. 44 |
| Feb. 28, 1958 | 321, 682. 76 |
| Feb. 28, 1959 | 311, 543. 06 |

Section 167 of the Internal Revenue Code of 1954 provides that "There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" of property used in a trade or business or for the production of income. In *Detroit Edison Co.* v. *Commissioner*, 319 U.S. 98, the Supreme Court said that the end and purpose of depreciation accounting "is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets." In *Massey Motors, Inc.* v. *United States*, 364 U.S. 92, the Supreme Court indicated that the "primary purpose of depreciation accounting [is] to further the integrity of periodic income statements by making a meaningful allocation of the cost entailed in the use (excluding maintenance expense) of the asset to the periods to which it contributes."

It must be emphasized that the capital assets being amortized here are *contract rights* to exhibit films on television. These contract rights are, for the most part, definitely limited in duration, and where they are not so limited, the respondent has allowed a 5-year life for them. None of the contract rights here involved have a duration of more than 5 years for purposes of amortization. It has long been established that in proper cases a contract right for a fixed or determinable period may be depreciated over the life of the contract. *Flynn, Harrison & Conroy, Inc.*, 21 B.T.A. 285.

Petitioner does not deny that we are dealing with contract rights but insists that its television exhibition rights are different because

---

[5] Respondent used a life of 49 months to amortize the additional payment of $82,338.63 in 1955 for the Film Owners picture rights, and also a life of 49 months for the payment of $16,467.72 in 1955 for the Major-Arista picture rights.

the bulk of its rental income comes from the first-run exhibition contracts with television stations, and that on successive rerun contracts the rentals drop rapidly so that the film rights it holds rapidly approach the zero point. Consequently, argues petitioner, its film rights are "essentially, depletable or wasting assets, *exhaustion of which occurred by use or extraction of the limited income or exploitation potential*, and not by the expiration of time." Petitioner states that, normally, the proper method of amortization in such a case would be one that follows the flow of income.

Petitioner argues on brief that the respondent has recognized that the methods of depreciation commonly used in depreciating or amortizing other assets are not appropriate for amortizing the cost of film being rented on television, and that amortization of such film cost must follow the flow of income. In Rev. Rul. 60–358, 1960–2 C.B. 68, the respondent accepted the "income forecast" method of computing depreciation for the cost of leased or rented television films, taped shows, and "other property of a similar character." [6] In Rev. Rul. 64–273 the respondent extended this liberal treatment to motion-picture films subject to an allowance for depreciation.

[6] "Advice has been requested as to the proper method for recovering the cost of leased or rented television films (including taped shows for reproduction) for Federal income tax purposes.

"It has come to the attention of the Internal Revenue Service that the methods of computing depreciation described in section 167(b) of the Code are in most cases inadequate when applied to television films, resulting in a distortion of income on the returns filed by taxpayers deriving income from such films. This distortion is caused by a strikingly uneven flow of income, earned by groups of programs within the series, resulting from contract restrictions, methods of distribution and audience appeal of the programs. If the film series is a success, additional income will be forthcoming from returns over a period of years, depending upon its popularity; whereas, unsuccessful film series may produce little or no income after the initial exhibition. Thus the usefulness of such assets in the taxpayer's trade or business is measurable over the income it produces and cannot be adequately measured by the passage of time alone. Therefore, in order to avoid distortion, depreciation must follow the 'flow of income.'

"Some producers of television films have used the so-called 'cost recovery' method in reporting their income. By use of this method, no taxable income is reported until the income from the films exceeds the cost thereof. However, such 'cost recovery' method is not acceptable for Federal income tax purposes.

"After an extensive study and consideration of the matter, the Service has concluded that the so-called 'income forecast' method is readily adaptable in computing depreciation of the cost of television films without producing any serious distortion of income. This method requires the application of a fraction, the numerator of which is the income from the films for the taxable year, and the denominator of which is the forecasted or estimated total income to be derived from the films during their useful life, including estimated income from foreign exhibition or other exploitation of such films. The term 'income' for purposes of computing this fraction means income from the films less the expense of distributing the films, not including depreciation. This fraction is multiplied by the cost of films which produced income during the taxable year, after appropriate adjustment for estimated salvage value. * * *

"If in subsequent years it is found that the income forecast was substantially over-estimated or underestimated by reason of circumstances occurring in such subsequent years, an adjustment of the income forecast for such subsequent years may be made. In such case, the formula for computing depreciation would be as follows: income for the taxable year divided by the revised estimated income (the current year's income and

But it is apparent that petitioner's method is not an "income forecast" method of amortization and, in fact, petitioner has strenuously insisted throughout that such method would not be feasible here because it would be impossible to estimate or forecast reasonably the future income from its television exhibition rights. Therefore, petitioner feels it is entitled to use the cost-recovery method under which it would realize no taxable income from the film rights until their cost had been fully recovered. In other words, petitioner's bold logic seems to be that where a taxpayer finds himself unable to qualify for this liberal income-forecast method of amortization, he is entitled to an even more liberal method. It may be that the forecast of future income from these film rights as of March 1954 would be a difficult task, but as the Supreme Court points out in *Massey Motors, Inc.* v. *United States, supra,* "prediction is the very essence of depreciation accounting." Moreover, Rev. Rul. 60–358 takes faulty initial forecasts into consideration and explicitly provides that "If in subsequent years it is found that the income forecast was substantially overestimated or underestimated by reason of circumstances occurring in such subsequent years, an adjustment of income forecast for such subsequent years may be made." [7]

We do not agree that the cost-recovery method is appropriate in this case. Among the cases cited by petitioner to support its use of this method are *Burnet* v. *Logan,* 283 U.S. 404; *Commissioner* v. *Liftin,* 317 F. 2d 234, affirming 36 T.C. 909; and *Willhoit* v. *Commissioner,* 308 F. 2d 259. In *Burnet* v. *Logan, supra,* the Court held that the taxpayer, selling stock in consideration of annual payments contingent on certain mining operations, was entitled to recover her basis in the stock before reporting any taxable income. The underlying rationale of that case and similar authorities was, as we pointed out in *Darby Investment Corporation,* 37 T.C. 839, affd. 315 F. 2d 551, "that the evidences of indebtedness there involved were speculative and therefore uncertain as to cost recovery because of a lack of security, because of no reasonable certainty as to the obligor's ability to

---

estimated future income), multiplied by the unrecovered depreciable film cost remaining as of the beginning of the taxable year.

"The total forecast or estimated income to be derived from the films should be based on the conditions known to exist at the end of the period for which the return is made. This estimate can be revised upward or downward, as explained above, at the end of subsequent taxable periods based on additional information which became available after the last prior estimate.

"Accordingly, it is the position of the Service that the 'income forecast' method described above constitutes an acceptable method for computing a reasonable allowance for depreciation of the cost of television films under section 167(a) of the Code."

[7] Respondent argues on brief that petitioner's contract rights to exhibit films on television do not qualify for the income-forecast method of amortization, and contends that his Rev. Rul. 60–358 is limited to producers of television films. We need not decide this question since petitioner's firm position is that the cost-recovery method of amortization must be used here.

pay and, generally, that they had no ascertainable fair market value." The *Liftin* and *Willhoit* cases both involved highly speculative contractual obligations purchased at substantial discounts and the question was whether the periodic payments on such obligations should be allocated partly to cost and partly to income, or whether the payments should be considered as a return of cost until the entire cost had been recovered. In *Darby Investment Corporation, supra,* the Tax Court held that periodic payments on land contracts *were* allocable between cost and income, and in its affirming opinion the Court of Appeals for the Sixth Circuit said: "Determination of the issue turns on the question of whether the investment in the contracts is of such a speculative nature that the purchaser * * * cannot be reasonably certain of ever recovering his cost. Burnet, Commissioner of Internal Revenue v. Logan."

Those cases were not concerned with proper methods of depreciation but with the proper time for reporting income, if any, from transactions so speculative in nature that the taxpayer is not reasonably certain of ever recovering his investment. The problems are different and we do not believe that the rationale of those cases has a ready application to the problem of a current method of depreciation. Even as a factual matter, we doubt that at the end of petitioner's first fiscal year, with the results of the year's operations at hand, it could be argued with any conviction that the petitioner's investment in the television exhibition rights was so speculative that a return of its investment was in doubt.

Petitioner asserts that as of February 28, 1955, its total basis for amortization of its television exhibition rights acquired up to that point was $1,753,565.94. Yet the record shows that as of that date the gross receipts of Unity (the petitioner's sister corporation which distributed the petitioner's film rights to the television stations throughout the country) were $1,666,451.28 and by the end of May 1955 were in excess of $2 million. We also note that petitioner's reported taxable income before amortization of film rights as of February 28, 1955, was $1,002,240.67. It also appears that during the fiscal year ended February 28, 1955, Unity had written contracts with television stations providing for rental income of approximately $1,875,000 from the exhibition of films. The allowance for depreciation or amortization is generally determined according to conditions as they exist at the end of the taxpayer's taxable year, and we do not believe that, under the above facts, the prospects for the recovery of petitioner's investment in its film rights was as dismal as petitioner makes out. There are also indications in the record that these film rights in the hands of the vendors were highly profitable and that petitioner and its associated corporations, in financing the purchase

of such rights, were able to obtain impressive bank loans presumably based upon the anticipated economic success of such film rights.

Petitioner's use of the cost-recovery method produces some rather startling results. Petitioner reported total taxable income before amortization in its returns for the fiscal years 1955 through 1959 of approximately $2,365,000 and yet showed a net loss in each of those fiscal years. Over this same period of 5 fiscal years Unity showed total gross billings of about $3,351,000. Except for taxable income of $5,054.62 in its fiscal year ended February 28, 1959, Unity reported net losses in its fiscal years 1955 through 1958. No dividends were ever declared by petitioner, Unity, USTV, or Adonis during their existence.

The statute allows as a depreciation deduction a "reasonable" allowance for the exhaustion of a business asset. In *Massey Motors, Inc.* v. *United States, supra,* the Supreme Court spoke of a "meaningful" allocation of the cost entailed in the use of the asset to the periods to which it contributes. We believe that, under the circumstances of this case, the allowance for amortization computed by the respondent on the straight-line method for the years here involved meets the above statutory and case criteria. We also find, and so hold, that each of the several groups of film rights should be amortized separately rather than as a composite group. Petitioner's argument for composite treatment is really keyed to its argument for the cost-recovery method of amortizing its film rights. We think respondent's approach is a reasonable one, and petitioner has not persuaded us that it should be disturbed.[8]

Petitioner's argument against the use of the straight-line method of amortizing its film rights has some similarity to that made in *Johnson* v. *Commissioner*, 302 F. 2d 86, affirming a Memorandum Opinion of this Court. In that case the Tax Court held that certain master plans held by the taxpayer should be depreciated over a period of 5 years on a straight-line basis. The taxpayer had argued that since the earnings from this plan came mostly in the earlier years of their use, it would be more meaningful to take depreciation on an accelerated basis proportional to actual sales during the 5-year depreciable life of the plans. The Court of Appeals for the Fourth Circuit, in its affirming opinion, said: "The taxpayer's complaint that depreciation on a straight line basis did not permit the asset to be written off in steps proportionate to the receipt of gain ultimately realized from it is essentially criticism of a straight line method of depreciation. It is

---

[8] We have examined petitioner's argument that its cost-recovery method yields the same results as the income-forecast method and we think it is without any merit in that the argument and its accompanying computations are based upon assumptions wholly unsupported by the record.

a criticism which the Congress recognized when it provided alternatives in the Revenue Act of 1954."

The Internal Revenue Code of 1954 provides liberalized methods of depreciation which concentrate depreciation deductions in the early years of the useful life of the property. Congress has specifically limited the application of these liberalized methods to certain categories of property new in use after 1953. We know of no authority, nor do we perceive any justification, for permitting in this case the use of the cost-recovery method in amortizing property such as television exhibition rights.

We sustain respondent on this issue.

*Decision will be entered under Rule 50.*