

Andrew G. Frederick, pro se.

Robert C. Zampano, U. S. Atty., District of Connecticut, New Haven, Conn., for respondent.

Before LUMBARD, Chief Judge, and MOORE and MARSHALL, Circuit Judges.

Granville B. Smith, Long Beach, Cal., and W. I. Gilbert, Jr., Los Angeles, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Meyer Rothwacks, Robert N. Anderson, and Charles B. E. Freeman, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before BARNES and KOELSCH, Circuit Judges, and YANKWICH, District Judge.

KOELSCH, Circuit Judge.

John D. Willhoit and Eleanor M. Willhoit seek a review of the decision of the Tax Court of the United States redetermining deficiencies in their respective income taxes for 1943, 1944 and 1945. Their income for those years was earned exclusively by John D. Willhoit (herein "the petitioner") while the taxpayers were residing at Long Beach, California, and was community property. Under the laws of that state, the income belonged equally to the spouses, and each of them reported one-half in separate but identical returns. The Tax Court consolidated their petitions for redetermination, and their petitions for review were similarly treated in this court.

The commissioner found petitioner realized net gain in five separate business transactions; the petitioner had either not reported any income at all from them, or had returned the gain in a sum less than that determined by the commissioner. The Tax Court held that in two of the five petitioner was not chargeable with a taxable gain; but with slight adjustments in amount of the deficiencies it sustained the commissioner's decision regarding the other three. The commissioner did not file a cross-petition, and it appears petitioner attacks the Tax Court's decision only in so far as it relates to his income tax liability on one of the three transactions, for he does not allude in his brief to the remaining two. However, one of the latter two transactions, save for amounts and dates, presents the same issues under essentially the same facts as the one to which petitioner devotes his entire attention; in our view of the case, it would be incongruous to consider one without the other.[1] The dispute thus centers upon petitioner's purchase from E. N. Frame on one occasion, and from C. S. Jones Associates on another, of vendors' interests in contracts for the sale of real property on deferred payments.

The purchase from Frame was consummated on or about January 27, 1941.

1. Since petitioner neither specifies or urges error with respect to the court's decision regarding the dissimilar transaction, we of course do not inquire into it.

Briefly, it appears that Frame, in association with several private investors and petitioner, had developed seven tract subdivisions, building in them numerous low-cost dwelling houses with the aid of construction loans from the Long Beach Federal Savings & Loan Association (herein "the association"). Each loan was uniformly made in an amount equal to 75% of the estimated value of the lot and contemplated improvement and was secured by a trust deed. The association retained a portion of the loan in an account known as the "impounded account," and which Frame pledged to the association as additional security from the construction loans. Frame sold the houses on conditional sales contracts that provided for a small down payment ranging from $25 to $50 and the balance of the purchase price in deferred monthly installments; he kept the down payment, but assigned the contracts to the association as further security for the loans. The assignment authorized the association to collect the monthly installments from the house purchasers and apply them, so far as necessary, to the payments then due upon the construction loans, but required the association to remit any overplus (less a collection fee of 25 cents for each payment) to Frame every month.

Petitioner's purchase was largely due to the association's efforts, and came about in the following manner: Frame, although very successful in building and selling houses, was not so fortunate in his selection of house purchasers. By December, 1940, over half of them had defaulted on their contracts, with the result that the construction loans were also delinquent. Because of this and for other reasons, relations between Frame and the association became so strained that the latter resolved to replace him. Knowing Frame was not unwilling to sell his interests, Gregory the association president, approached petitioner with the suggestion that he buy out Frame. Petitioner was interested but lacked sufficient funds; however,

Gregory readily offered petitioner a loan designated as loan 8334, and the sale was thus consummated.

By the purchase, petitioner acquired Frame's interest as vendor in approximately 800 conditional sales contracts and the subject real property, together with Frame's credit in the "impounded account"; the lots were subject to the association's trust deeds, and the contracts and impounded account were subject to Frame's security assignments. At that time the aggregate principal amount owing on the contracts was $1,799,602.47, Frame had a credit of $47,994.42 in the account, and the principal amount unpaid on the construction loans was $1,297,861.10. The consideration for the sale consisted of $110,000 cash paid to Frame plus the mutual cancellation of an open account between Frame and petitioner. The Tax Court found the open account weighed in petitioner's favor by $5,000, although the petitioner sought to prove (but his proof was rejected) that the sum in fact was in excess of $60,000.

The association loaned petitioner the $110,000, and he executed a second trust deed to the real property; he also agreed to pay the association a commission of $40,000 for negotiating the sale, and gave the association an assignment of the house purchasers' installments on the contracts sufficient to make that amount. This latter assignment was subject to Frame's prior assignment.

Jones and his group, like Frame, had also developed a housing tract with the financial aid of the association. They had executed trust deeds for the loans and assigned the conditional sales contracts for the sale of the houses to the association as additional security. Here, too, house purchasers in large numbers had failed to meet their obligations, causing the construction loans to become delinquent and the association to fear financial loss. Again, the association turned to petitioner, who on June 3, 1941, purchased Jones' interests with money borrowed from the association. On this occasion, petitioner acquired 105

conditional sales contracts and the subject real property, together with 15 notes and deeds of trust that were made by house purchasers whose contracts were converted into notes and trust deeds as part of the transaction. At that time, the total principal amount owing by house purchasers on their contracts and notes was $333,642.46, and the principal amount owing to the association on its construction loans was $224,786.00. Petitioner paid $61,020.31 for the property, borrowing that sum from the association. This loan was designated #174–c and was secured by a second trust deed on the real property.

Shortly afterwards, petitioner executed an instrument whereby he authorized the association to accumulate in a reserve all collections on contracts and apply them indiscriminately to any of the loans, rather than simply to the one on the property producing the collection.

The association's selection of petitioner to take over the various properties was a wise one, for within a short time most of the delinquencies were either corrected or the contracts were forfeited and new purchasers were found who entered into conditional sales contracts essentially similar to those they superseded. From time to time, when the balance in the reserve exceeded an amount the association deemed sufficient to retain as security, the excess was disbursed to petitioner; the association likewise disbursed to petitioner the credit balance held in the impounded account.

In his income tax returns for 1941 through 1945, petitioner reported these disbursements (plus the down payments made by purchasers of repossessed properties) as his total gross income from the transactions in those years. In his returns for 1941, petitioner did not allocate to the recovery of capital any part of the disbursements, but thereafter did so.

In early 1946, the Home Loan Bank Board, believing that the association's fiscal management was so unsound as to endanger its solvency, seized control, placing in charge as conservator one A. V. Amman. During the course of the ensuing investigation, information was received by the district attorney indicating petitioner might be guilty of income tax evasions growing out of his dealings with the association. At the request of the district attorney, petitioner was interviewed and subjected to searching questioning concerning his business affairs; but no indictment against him was ever sought and the association was ultimately returned to the management of its regular officers in 1948. However, while the investigation was under way, petitioner and his wife executed consents in writing extending the time allowed the commissioner to assess income tax deficiencies, and it was pursuant to these waivers that the commissioner was able to make the determinations now on review.

The first question goes to the validity of these several extension agreements. In the Tax Court, petitioner argued that they were secured by duress and hence did not toll the general three-year statute of limitations for assessments (26 U.S.C.A. § 6501). The Tax Court, however, found the issue against petitioner, and the survey of the evidence satisfied us that this finding was not erroneous.

It is true that the seizure of the association was attended with much publicity and no doubt gave rise to considerable clamor amongst depositors and others directly interested. It is also apparent that petitioner and his wife were greatly alarmed over the possible outcome of the investigation and anxious to demonstrate to those in charge their own good faith and freedom from wrongdoing. But it nowhere appears that the petitioner or his wife was coerced into executing the waivers (or any of the renewals). The record simply does not support petitioner's charge that the waivers were the product of any threat. His own testimony completely exonerates the public officials of such misconduct

and demonstrates the voluntary character of the consents.[2]

We come now to the merits. It was and is petitioner's contention that as a taxpayer who reports his income on the cash receipts and disbursements method of accounting, he will not realize any taxable gain until after he recovers his cost.[3] Although acknowledging that he purchased the contracts for less than the amount owing on them and that he may ultimately make a profit in amount of the difference—that is to say, the discount—nevertheless he argues that it is extremely uncertain whether he will ever recover his capital investment, let alone realize a taxable gain.

The Tax Court rejected petitioner's contention. It held that each installment collection was net gain in the proportion which the overall discount bears to the outstanding indebtedness on the conditional sales contracts. Pointing out that the purchase price was definite and the buyers were unconditionally obligated to pay, the Tax Court stated that whether petitioner in fact made a profit was "dependent upon the ability and willingness—elements involved in all sales other than sales for cash—of house purchasers to make payment of the specified sums they had agreed to pay." As we read its decision, the Tax Court rested its decision principally on the fact that the obligations of the house purchasers were liquidated in amount and fixed in point of time.

We recognize that whether petitioner in fact enjoys a gain or sustains a loss depends to some extent upon the caliber of the particular house purchaser, but we cannot agree with the Tax Court that transactions of the kind revealed by this record can be treated as closed simply because the purchasers are legally bound to pay a fixed sum in installments. The Tax Court has recently spoken on the subject, and declared that the elements of risk and uncertainty of full performance of installment contracts are material factors. Thus in Liftin v. Commissioner, 36 T.C. 909 (1961), the Tax Court stated that "Where a taxpayer acquires at a discount contractual obligations calling for periodic payments of parts of the face amount of principal due, where the taxpayer's cost of such obligations is definitely ascertainable and where there is 'no doubt whether the contract[s] [will] be completely carried out' (Hatch v. Comm. [2 Cir.] 190 F.2d 254 at 257), it is proper to allocate such payments, part to be considered as a return of cost and part to be considered as the receipt

---

2. Mrs. Willhoit was not a witness. Petitioner's own version of the matter is exemplified by this extract from the record:

When questioned by Mr. Doherty, petitioner's counsel:

"Q. Mr. Willhoit, were you at any time informed that you would probably be indicted for income tax evasion?

"A. I was.

"Q. When did you first receive that information?

"A. 1946.

"Q. Do you recall the time in 1946? Do you recall what period in that year?

"A. Yes, November.

"Q. What was your source of information?

"A. Well, the headlines in the newspapers, and the talk that was around. I learned it from sources around the Long Beach Federal Savings and Loan Association where the seizure had taken place by the Home Loan Bank."

On cross-examination, Willhoit testified:

"Q. Now, you testified that Mr. Olsgaard requested you to sign those documents. What did he say to you?

"A. I can't remember the exact words he said. I have had these documents presented to me ever since that date and somebody at intervals has asked me to sign them, but I couldn't remember his words when he came and says, sign them. He brought them down.

"Q. You also testified that at the time you signed them that there was a threat of indictment?

"A. There was.

"Q. Who made that threat to you?

"A. The threat was everywhere. It was in the newspapers, it was on the radio. It was big headlines. Letters had been written asking for the indictment and I knew of the letters."

3. This method of treating receipts is generally known as the "deferred payment recovery of cost method of accounting."

of discount income; but, conversely, when it is shown that the amount of realizable discount gain is uncertain or that there is 'doubt whether the contract [will] be completely carried out' the payments should be considered as a return of cost until the full amount thereon has been recovered and no allocation should be made as between such cost and discount income."

We are in accord with that test. In Phillips v. Frank, 295 F.2d 629 (9th Cir. 1961), the taxpayer had bought real estate contracts from the vendors at a discount, payable in installments; it appeared the contracts had no market value "in excess of taxpayer's costs"; there had been some repossessions and losses, and "[t]he only source from which he might reasonably expect to realize any part of his profit is from periodic payments subsequent to the return to him of his invested capital." On those facts it was held the taxpayer's collections constituted a return of capital until such time as they exceeded his cost, and only then was he chargeable with a gain.

■ In the instant case, petitioner's income should have been accorded the same treatment. The facts are even more compelling than those in Phillips. The degree of risk inherent in both of petitioner's transactions was such that it cannot fairly be found that he would realize a profit. The very circumstances of the purchases demonstrate that he was embarking upon a hazardous salvage operation with prospects of foreclosure of already delinquent trust deeds not unlikely. The Tax Court did not find the market value of the contracts; it simply noted its disagreement with petitioner's contention that they "had no ascertainable fair market value," despite his uncontradicted testimony that there was no market for the contracts even if they were not subject to the assignments to the association. We think it requires more than ordinary optimism to hold on this record that petitioner would probably realize more than his investment in either of these transactions. "The liability for income tax ultimately can be fairly determined without resort to mere estimates, assumptions and speculation. When the profit, if any, is actually realized the taxpayer will be required to respond." Burnet v. Logan, 283 U.S. 404, 412–13, 51 S.Ct. 550, 75 L.Ed. 1143 (1930).

To the extent that the deficiencies determined by the Tax Court are attributable to an allocation of installment collections between a return of capital and taxable gain, the decision of the Tax Court is erroneous and must be reversed. However, the case must also be remanded. The Tax Court's finding of a deficiency in one of the three transactions was not attacked on appeal, and for that reason alone the petitioner's tax liability must be recomputed.

Additionally, it is not clear that the petitioner has not realized some net gain from one or both of the two transactions that are before us, and this uncertainty likewise must be resolved by the Tax Court and reflected in its decision.

If the petitioner assumed Frame's and Jones' liability on the construction loans, then his investment includes this liability. In that event, the whole of the installment payments would constitute his gross income. But he realized no taxable gain until a sufficient number of installments (plus the amount in the "impounded account" in connection with loan 8334) were paid by house purchasers to liquidate both the construction loans and the loans to the petitioner. If he did not assume his vendors' liability on the construction loans, this liability would not be included in his investment and his tax base would be lessened pro tanto; but nevertheless this reduction would not affect the result because, by reason of the Frame and Jones assignment of the installment payments to liquidate the construction loans, the petitioner was chargeable only with the overplus of the installments, and until these (together with the amount in the impounded account) equalled his own cost he realized no net gain.

■ Since the cases must be remanded, we find it necessary to discuss

the Tax Court ruling on the admission of certain evidence. Part of petitioner's cost of the Frame contracts and interests was the excess of petitioner's claim against Frame upon striking a balance of the latter's current account. The indebtedness resulted from petitioner's advances to aid Frame in constructing houses, and a written record of these sums and Frame's credits was kept by Gregory. Petitioner had no independent recollection of the respective debits and credits, nor did he produce the writing. Instead, he sought to prove by the testimony of Gregory that the balance in his favor was "in excess of $60,000." The Tax Court sustained an objection to the proffered proof, on the sole ground that petitioner had not shown due diligence in attempting to secure the record itself. The Tax Court was convinced that the amount was substantial and, following the so-called "Cohan rule" (Cohan v. Comm., 39 F.2d 540 (2d Cir. 1930)), limited the sum to $5,000.

"[T]here can be no doubt that the p[etitioner] was bound to account for the non-production of the original. * * and the question is whether such search was made for it, as to justify the admission of secondary evidence * * * The extent to which the [best evidence] rule is to be pushed, in a case like the present, is governed in some measure by circumstances. If any suspicion hangs over the instrument, or that it is designedly withheld, a more rigid inquiry should be made into the reasons for its non-production. But when there is no such suspicion, all that ought to be required is reasonable diligence to obtain the original. Has that been shown in this case?" Minor v. Tillotson, 7 Pet. 99, 32 U.S. [63] 99, 8 L.Ed. 621 (1833). We think that the answer is manifestly "yes." The sufficiency of the preliminary proof of diligence is addressed to the sound discretion of the trial judge, whose determination will not be disturbed in the absence of clear evidence of mistake amounting to an error of law (Brown v. Gow (1933) 128 Cal.App. 671, 18 P.2d 377; White v. White (1940), 39 Cal.App.2d 57, 102 P.2d 432; 32 C.J.S. Evidence § 842, p. 772). The proof here is, in substance, that Gregory kept the record; he stated it was in a safe at the association's office when the Federal Savings & Loan Board seized the association and placed Amman in charge. Amman denied any knowledge of the document and asserted everything was restored to Gregory at the time the Board relinquished control. Petitioner had made demand for the return of the record on both Gregory and Amman, as the authorities indicate he should (U. S. v. Reyburn, 6 Pet. 352, 31 U.S. [238] 352, 8 L.Ed. 424 (1832); Robertson v. Pickrell, 109 U.S. 608, 3 S.Ct 401, 27 L.Ed. 1049, and Improvement Co. v. Munson, 14 Wall. 442, 81 U.S. 442 (1871)). But each of them repeatedly denied the possession and pointed to the other. Faced with this dilemma, petitioner reinforced his demand by an action against the Board and Amman; the suit was still pending in the United States District Court when this matter was before the Tax Court.[4] We think the secondary proof should have been admitted; its weight and effect, of course, is for the Tax Court and is not a proper matter for our consideration.

4. It appears the suit is in the nature of one for the return of possession of the record and damages. As this opinion was about to be filed, petitioner sought to augment the record on appeal with a copy of an interlocutory judgment rendered on August 3, 1962, by the district court in that suit. This judgment shows that the district court made extensive findings to the effect that the record is lost and that it would reveal petitioner's claim exceeded Frame's by more than $61,000 and that Amman and the Board are liable in damages for the loss. But the commissioner, not being a party to that suit, is not bound by the judgment. The doctrine of res judicata and the auxiliary doctrine of collateral estoppel are only applicable to prevent relitigation between the same parties or their privies. Lawlor v. Nat. Screen Service Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); Bruszewski v. U. S., 181 F.2d 419 (3d Cir. 1950).

The decision is reversed and the cases are remanded to the Tax Court with directions to take further evidence relating to the purchase price paid by petitioner for Frame's interest, and to redetermine the deficiencies, if any, in conformity with this opinion.

United States Court of Appeals Fifth Circuit.