Lee M. SEILER, Plaintiff,

v.

LUCASFILM, LTD., Twentieth Century-Fox Film Corporation, George W. Lucas, Jr., and Joseph E. Johnston, Defendants.

No. C–83–0696 WHO.

United States District Court,
N.D. California.

Oct. 16, 1984.

Bronson, Bronson & McKinnon, San Francisco, Cal., John R. Murtha, Moraga, Cal., for plaintiff.

Joel E. Boxer, Dorothy Wolpert, Nutter, Bird, Marella, Boxer Wolpert & Matz, Beverly Hills, Cal., John W. Keker, Robert A. Van Nest, Keker & Brockett, San Francisco, Cal., for defendants.

## OPINION

ORRICK, District Judge.

This copyright case is based upon charges by plaintiff that defendant creators and producers of the movie "The Empire Strikes Back" ("ESB") copied some of his drawings for use in that film. Plaintiff possesses no originals of any of the work he contends was copied by defendants. In fact, plaintiff has been unable to produce any neutral third party who currently has in his or her possession an original or duplicate of the works in issue which that person possessed prior to the release of ESB. Instead, plaintiff seeks to introduce secondary evidence in the form of copies, reconstructions, projections, and the like in lieu of the originals in order to establish the content of those originals. The question presently before the Court is whether plaintiff can show as required by Federal Rule of Evidence 1004 that he did not lose or destroy the originals of his drawings in bad faith. The evidence offered by plaintiff is so inherently and overwhelmingly unbelievable that the Court finds that plaintiff has failed to meet his burden on the preliminary issue of loss or destruction without bad faith. Therefore, all secondary evidence offered to prove the contents of the missing originals is inadmissible.

## I

On February 14, 1983, plaintiff Lee M. Seiler filed a complaint against defendants Lucasfilm, Ltd., Twentieth Century-Fox Film Corporation, George W. Lucas, Jr., and Joseph E. Johnston arising out of defendants' alleged copying of plaintiff's artwork. Plaintiff's amended nine-count complaint alleges that three 'of his Garthian Strider designs ("striders") were unlawfully appropriated by defendants for use in the film ESB, a sequel to "Star Wars." [1] The striders originally in issue were (1) the AO 785/2 "Garthian Sprinter" ("AO 785/2"), (2) the AO–34E "Garthian Walker" ("AO 34E"), and (3) the 788 "Roundheaded Strider" ("788"). Plaintiff has since admitted that the 788 was not copied by defendants. As such, that strider is no longer in suit. Plaintiff seeks injunctive relief, monetary damages measured by defendants' revenues, imposition of a constructive trust over all profits and advancements derived from the works allegedly copied, and for punitive damages.

Plaintiff's first six causes of action are for copyright infringement; plaintiff alleges that defendants copied from all or some of four different publications. The seventh cause of action alleges violation of the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* The eighth cause of action alleges various unfair competition practices in violation of California Business and Professions Code §§ 17200 *et seq.*, and the ninth cause of action seeks imposition of a constructive trust over all revenue received as a result of patent No. 266,777 owned by defendants Lucas and Johnston.[2]

The Court, acting pursuant to Federal Rule of Evidence 104(a), granted the parties' motions for an evidentiary hearing in order to determine the preliminary question of whether the originals were lost or destroyed in bad faith. The Court heard testimony over seven days from nine witnesses presented by plaintiff and five witnesses

---

**1.** Plaintiff also filed two related lawsuits. One is identical to this lawsuit except that the complaint alleges infringement in "Return of the Jedi," another sequel to "Star Wars." The other lawsuit is against commercial licensees of defendants Lucasfilm and Twentieth-Century Fox for secondary infringements through products using the contested designs. All three cases were consolidated for discovery.

**2.** The trial of this case was bifurcated, so that the parties would first try the question of defendants' use of plaintiff's works in the movie ESB, and then if necessary, the issue of relief.

presented by defendants, and viewed in excess of one hundred documentary exhibits.

On September 25, 1984, counsel for the parties submitted their proposed findings of fact. On September 26, 1984, parties' counsel submitted counterfindings of fact and also conclusions of law. Both parties also briefed the nature of the evidentiary hearing conducted by the Court, the applicability of Federal Rules of Evidence 104, 1004, and 1008 to the findings and counterfindings, and the proper standard to be applied by the Court in analyzing the evidence proffered at the hearing. On October 1, 1984, the parties orally argued their positions to the Court, whereupon the matter was taken under submission.

At the outset, the Court repeats for emphasis that the great bulk of plaintiff's testimony was unbelievable, often bordering on the incredible. Plaintiff testified extensively concerning the "facts" surrounding the destruction and loss of plaintiff's originals, only to materially alter his version of those facts upon cross examination, and often again upon redirect and recross examination. Not surprisingly, the majority of these bizarre "facts" were not corroborated by any neutral or independent third party.[3] In particular, plaintiff's version of the circumstances surrounding the destruction of his originals by flood, was inherently unbelievable and disturbingly contradictory. In sum, it appears to the Court that the absence of any originals of the works in suit, or even a single copy produced by any independent third party that was possessed by that third party prior to the release of ESB, is far from accidental or providential. Accordingly, the testimony and other evidence adduced by plaintiff at the evidentiary hearing does not meet the even minimal showing required under Federal Rule of Evidence 1004 in order to justify admission of secondary evidence to prove the contents of the missing originals.

## A. Background.

Plaintiff is an artist and designer of science fiction creatures and machines. Plaintiff began creating a "family" of Garthian striders some time prior to the release of ESB to the public. Plaintiff claims that the two works in issue in this suit, the AO785/2 and the AO34E are part of this family of striders. Some of the publications containing the works in suit are claimed to have been first published as early as 1976; others are claimed to have been first published in 1977. The publications were not registered with the United States Copyright Office until 1981, 1982, and 1983. The movie that is the subject of this suit was first released in May 1980, although certain promotional portions of the movie were released for public viewing several months prior to May 1980.

## B. Plaintiff is Skilled in Reproduction Techniques.

Plaintiff is skilled in various reproduction techniques, including making blueprint and offset materials. He has often made his own negative and positive reproductions without the use of outside vendors. Plaintiff has often created several versions of the same basic material. Plaintiff has transposed portions from one or more sets of materials onto other subsequently-created materials, utilizing cut-and-paste and other reconstruction techniques. Plaintiff's business practice is to reuse portions of his existing graphic materials on subsequent materials.

## C. Destruction of Originals by Flood.

Plaintiff claims that the vast majority of his original artwork, including original artwork depicting the AO785/2 and AO34E, was destroyed in 1979 by "flood." Such materials were allegedly stored underneath a geodesic dome house that plaintiff was in the process of building in Boonville, California. The house consisted of a geodesic

---

**3.** Those persons who did provide corroboration of the loss and destruction of plaintiff's originals were persons arguably under the "control" of plaintiff: his wife, and his business partner who admitted to having a contingency interest in the suit.

dome placed upon a wooden platform. According to plaintiff, the area beneath the dome where the materials were stored consisted of dirt and gravel, was probably open on three sides and fenced in on the remaining side by chicken wire, or entirely fenced in by chicken wire. Plaintiff claims that all of his original artwork stored in cardboard boxes underneath the dome house in this dirt and gravel area were completely destroyed by some sort of extensive water damage, such that the entirety of those materials had to be discarded at the Mendocino dump.

The Court finds that the testimony concerning the water damage and the resulting destruction of the bulk of plaintiff's original artwork, was inherently unbelievable, contradictory, and unsupported by the testimony of neutral witnesses. The Court's finding is based upon the following:

1. Plaintiff testified at the first session of his deposition that he discovered the damage to his artwork stored underneath the dome house when he first returned to the dome house in July or August 1979. Plaintiff also testified at that time that he did not add any additional material to the material already stored, but immediately discarded the damaged material. At a later deposition session and at the evidentiary hearing, however, plaintiff testified that he did not discover the water damage to the stored materials until six or eight weeks (or longer) after he returned to the dome house, and that, although he was aware of the damage sustained by the stored materials, he added as many as twelve more boxes of original material to those already stored under the dome. It was not until some time in September 1979 that plaintiff rediscovered the damage and discarded the entire store of boxes containing the artwork.

2. Plaintiff testified in several deposition sessions, and upon direct examination at the evidentiary hearing, that all of the original artwork stored underneath the dome house was damaged beyond restoration or use, and that plaintiff discarded all of the boxes containing those materials at the Mendocino dump. Halfway through the evidentiary hearing, however, plaintiff suddenly recalled that he had in fact saved 100 boxes of original artwork and other such materials. Plaintiff did not testify as to what happened to the materials contained in those 100 salvaged boxes.

3. The testimony concerning the number of boxes, and hence, the amount of artwork stored under the dome house was contradictory. Plaintiff's wife, Mary Graves, testified that there were approximately 30 to 50 boxes stored, and that the boxes were stacked about four feet high. Plaintiff, on the other hand, testified that approximately 140 boxes were stored underneath the dome house.

4. Neither plaintiff, nor any other witness offered by plaintiff, could explain the source of the water that plaintiff claims completely destroyed his original artwork. Plaintiff testified that the soil comprising the dirt and gravel floor upon which his work was stored was very wet soil, and that he had installed a drainage pipe underneath the dome in order to siphon off any excess runoff. Yet, plaintiff offered no explanation for how such wet soil could completely soak and damage beyond salvage boxes that were stacked four feet from the soil. Although Graves testified that she saw water on top of the stacked boxes, plaintiff could offer no evidence of any rainfall in the summer months in which the water damage allegedly occurred, no leakage from household plumbing, or any other such plausible explanation for the extensive water damage suffered. Additionally, plaintiff testified that the damage to the boxes was uniformly complete, requiring that all boxes be discarded. Yet plaintiff offered no explanation for how, in a mere six to eight week period of time, such damage could occur to newly stored boxes to the same extent as boxes previously stored under the house.

5. Graves testified that she had ten boxes containing her personal belongings also stored underneath the dome along with plaintiff's artwork, and that the boxes were equally unprotected from water and other

elements. Graves also testified that her ten boxes survived the water incident without suffering any water damage.

6. Although Graves testified that she was not physically present when plaintiff discovered and discarded the boxes stored under the dome house, she testified that she was somehow able to salvage two pieces of artwork. Those two items are two different plans, one happening to depict the AO785/2, and the other happening to depict the AO34E, the works in issue in this suit. Graves testified further that she "baked" these plans in order to dry them out, although she offered contradictory testimony concerning where and when this baking was done. Graves said that she did not tell plaintiff that she was able to save the two pieces of artwork until 1981, some time after plaintiff had first contacted defendants with charges of unlawful appropriation of the very designs depicted on the two pieces of salvaged artwork.

7. The existence of the "flood" and the almost complete destruction of the vast majority of plaintiff's original artwork including the designs in issue in this suit, cannot be corroborated by any neutral or independent party.

8. Neither plaintiff nor Graves could remember with any certainty whether either one of them conducted an extensive search through the boxes in order to determine which items, if any, contained therein were salvageable before discarding the entire store of boxes.

9. Plaintiff took no photographs of the claimed damage, nor did he produce any documentary evidence supporting the existence of the damage.

10. Plaintiff made no insurance claim for damage caused by the incident.

D. *Bad Faith Nonproduction.*

The Court finds that the originals of the AO785/2 and AO34E were not destroyed by water in the dome house incident in 1979, but that the originals depicting those works have been purposefully destroyed or withheld from production. The finding is based on the following:

1. Plaintiff claims that he and Graves sold copies of the AO785/2 and AO34E at the San Jose Fantasy Convention in February 1979. Photographs of plaintiff's booth at that convention, however, do not reveal the presence of drawings or other materials containing either of the works in issue, although many of plaintiff's other unrelated works are clearly depicted. The sign posted at plaintiff's booth during that convention refers to the Garthian Strider in the singular;[4] both parties admit that plaintiff sold the 788 strider, not in issue in this suit, at that convention. Four independent witnesses testified that they visited plaintiff's booth at the convention and, although they confirmed the existence of the 788 strider, none saw any materials depicting, or referring to, the AO785/2 or AO34E. None of the witnesses were told by plaintiff about any striders other than the 788, although at least two of the witnesses recall talking to plaintiff extensively about plaintiff's strider materials. Finally, plaintiff's business partner at the time, Mitsuro Ikuta, testified that he does not remember any of the works in issue available at the San Jose Fantasy Convention.

2. In December, 1978, plaintiff and Ikuta wrote to the Japanese publishers of *Starlog* magazine listing the products that they had available for sale, as well as products that were not currently available, but contemplated to be so in the near future. The 788 strider was identified as "first in a series"; and although plaintiff claims that the AO785/2 and AO34E were in existence and available for sale in 1978, no mention was made of either of those works in the letter.

3. Although plaintiff placed advertisements in several magazines during 1979 and 1980 advertising the 788 strider and other unrelated materials, none of the ad-

---

**4.** The sign states: "Blue Prints of the Garthian Strider. You Can Build It!!" when referring to the strider plans for sale.

vertisements refer to the AO785/2 or the AO34E.

4. Plaintiff has no records prior to the time of his access to ESB materials of any customer orders or customer correspondence depicting or referencing the AO785/2 or AO34E.

5. Product order codes utilized by Graves in 1979 and 1980 to account for customer orders by product did not contain differentiation between striders ordered, as was the case for other materials of which there were multiple versions sold by plaintiff. Graves testified that, although multiple striders were for sale in 1979, only the 788 strider was available for sale in 1980.

6. Shortly after the release of ESB, plaintiff drafted a letter to Dan Dawes, attorney for defendant Lucasfilm, in which plaintiff discussed materials he considered to be infringed upon by defendants; none of the materials identified are the AO785/2 or the AO34E.

7. In late 1982, after plaintiff retained attorneys for this lawsuit, plaintiff sent out a survey to over 2,500 persons from plaintiff's mailing list inquiring whether any of those persons currently possesses or at one time possessed a copy of the AO785/2 or AO34E.[5] The survey also asked whether any customer had any interest in ordering or "replacing" such materials at a 30 percent discount. The results of the survey did not produce anyone who possesses or possessed a copy of the AO785/2 or AO34E. As a follow-up to this survey, plaintiff sent any person who responded indicating an interest in receiving plaintiff's works, a free complimentary copy of the plans of the AO785/2 and AO34E, products the follow-up letter identified as having been sold in the past.

8. Plaintiff filed with the United States Copyright Office copyright registration applications for the works in issue. Plaintiff did not attach as the deposit sample of his works either originals, or duplicates, produced at the time of first publication. Rather, plaintiff "reconstructed" the publi-

cations as he claimed they appeared upon first publication in 1976 or 1977. Several of the deposit copies contain text which is internally inconsistent, as well as inconsistent with the artwork accompanying the text. Additionally, at least one of the advertising fliers claimed to have been published in 1976 was in fact never published, but was instead a proof copy.

9. Neither plaintiff nor any witness possesses originals of the AO 785/2 or AO34E.

10. No independent third party possesses copies of the AO 785/2 or AO34E which that person possessed prior to 1980.

### E. Fabricated Evidence.

Plaintiff seeks to introduce a variety of secondary evidence for the purpose of proving the contents of the missing originals. The Court finds that much of this evidence has been fabricated or misrepresented to the Court. In particular, the Court finds the following:

1. The Samuel Comstock letter and accompanying flier depicting the AO34E could not have existed in its present form prior to 1980, although the envelope bears a 1979 postmark date.

2. The document containing the note to "Mitch" Ikuta dated 12/76, indicating plaintiff would visit Ikuta in a few days, did not exist as dated, because plaintiff was living in Ames, Iowa, during the period in question. Ikuta testified that he was unfamiliar with the document.

3. The half-inch videotape containing snippets depicting plaintiff's original garthian materials was not filmed in 1978 as plaintiff claims. Plaintiff testified at his deposition that no copies of the videotape inventory had been made and that the original three-quarter inch videotape had been lost. The videotape that is claimed to be a copy of this "lost" three-quarter inch tape is on one-half inch tape and is a third or fourth generation copy. Plaintiff's explanation as to its present condition was unsatisfactory and purposefully confusing. Additionally, segments plaintiff contends

were taped in 1979 are strikingly similar to segments plaintiff contends were taped in 1978, including the lighting, camera angle, background music, and position of desk blotter stamp, indicating that all of the segments were created at the same time. The claimed 1978 segment containing a piece of paper with "1978" written upon it was created purposefully to misrepresent the true date of the tape's creation.

4. The blueprint plans "found" by Ikuta in his briefcase were not placed in that briefcase prior to 1978, as Ikuta contends. At Ikuta's first day of deposition on June 28, 1983, Ikuta responded to a subpoena requiring production by producing a copy of a 1980 printed version of *The Garthian Culture*, contending that he had retrieved it from a briefcase that had been locked and unopened since 1978. On the second day of his deposition, Ikuta produced a large number of blueprints depicting the AO785/2 and AO34E, claiming that, although he had previously conducted a thorough search of the briefcase in compliance with the subpoena, he had "overlooked" the bulky plans he produced on the second day. The briefcase in which the documents were found is a regular-sized briefcase, approximately four inches thick.

5. The film "found" by Ikuta in his freezer was not placed in that freezer in 1978, as Ikuta contends. Ikuta testified that he had found the film in the freezer compartment of a refrigerator Ikuta shared with the plaintiff, that the film had been there since 1978, but that he had never before noticed the presence of the film in the freezer. The freezer compartment is admitted to be only about two or three cubic feet in size, and has not been defrosted since 1976. The box containing the film does not suffer from "freezer burn" or other such damage. Ikuta has a 4 percent contingency interest in the lawsuit.

6. The materials found by Graves that were "found" in early 1984 in a storage box containing kitchen goods were not placed there in 1979. The box was stored in a commercial storage unit that Graves

shares with plaintiff. Graves testified that she found the documents as "filler" among kitchen goods that she packed in 1979, that she doesn't recall placing the documents in with her personal kitchen items, that the box has remained unopened since 1979, even though Graves has moved six times during that time period, and that she has no idea how the documents came to be in her personal storage box. Graves further testified that she did not search her personal boxes in connection with this suit prior to 1984, despite the obvious importance of locating these exhibits.

7. The plans claimed to be salvaged from the dome house water incident and "baked" by Graves, contain pictures of the AO785/2, which has one continuous canopy in the place of eyes, yet the text accompanying that picture refers to "compound eyes." The 788 strider, not in issue in this suit, contains compound eyes.

F. *Testimony of Independent Witnesses.*

Plaintiff called to testify six independent witnesses, in order to establish that the originals of the AO785/2 and AO34E were destroyed or lost without bad faith, and that such documents were in existence prior to the release of ESB. After careful consideration of each witnesses' testimony, this Court finds:

1. None of the witnesses possess an original or copy of the AO785/2 or AO34E which that witness possessed prior to 1980.

2. None of the witnesses were able to positively and consistently identify the AO785/2 or AO34E as being in existence prior to 1980.

G. *Conclusion.*

In sum, based upon seven days of testimony elicited from fourteen witnesses, and careful consideration of over one hundred exhibits, the Court finds that:

1. Plaintiff testified falsely as to the destruction of the original artwork depicting the AO785/2 and AO34E in a 1979

"flood" underneath his Boonville dome house.

2. Plaintiff purposefully destroyed or withheld in bad faith the original artwork depicting the AO785/2 and AO34E.

3. Plaintiff fabricated and misrepresented the nature of secondary evidence for use in this lawsuit.

## II.

### A. *Application of Federal Rule of Evidence 1004.*

Federal Rule of Evidence 104(a) provides that preliminary questions concerning the admissibility of evidence shall be determined by the court. Fed.R.Evid. 104(a). Federal Rules of Evidence 1004 and 1008 further delineate the duty of the court in determining preliminary questions regarding admissibility. Rule 1004 provides that secondary evidence of the contents of a writing, recording, or photograph is admissible unless the proponent of the evidence lost or destroyed the originals in bad faith. Fed.R.Evid. 1004(1). Rule 1008 states that the determination of whether a condition has been fulfilled is ordinarily for the court to decide. Therefore, Rule 1004 read in conjunction with Rule 1008 makes the determination of whether the proponent of the evidence has established that all the originals were lost or destroyed without bad faith a question for the court. Rule 1008 provides further that the trier of fact is to determine the question of whether the originals ever existed. Fed.R.Evid. 1008.

■ The burden of proving loss or destruction under Rule 1004 is on the proponent of the evidence. *See* 5 Weinstein's Evidence, § 1004(1)[05] at 1004–16.

The parties in this case agree that the central inquiry is whether plaintiff's original artwork depicting the AO785/2 and AO34E existed in 1979 and earlier and was principally destroyed by water damage, or whether, as defendants contend, the originals were created following plaintiff's access to materials utilized in the creation of ESB and have been intentionally withheld or destroyed in order to facilitate the admission of secondary evidence.

Plaintiff characterizes this inquiry as a jury question, and as such, inappropriate for this Court to decide as a preliminary matter. Plaintiff reasons that the Court must focus solely on the time period particularly in issue here, that period of time preceding plaintiff's access to ESB materials; the question then becomes whether the AO875/2 and AO34E ever existed during that time period. Plaintiff argues that this puts the issue squarely within Rule 1008's allocation of such questions to the jury.

Defendants, on the other hand, contend that the originals did exist at some time (an inescapable conclusion given the second and third generation copies sought to be offered by plaintiff), but that the originals were created following plaintiff's access to ESB materials, and have been intentionally withheld or destroyed to conceal the true date of their creation. Therefore, defendants characterize the issue as not whether the originals ever existed, but whether the originals have been lost or destroyed in bad faith, a proper preliminary determination for the Court under Rules 104(a), 1004, and 1008.

The Court finds defendants' characterization to be the correct one. First, the originals must have existed at some time so that plaintiff could create the copies he seeks to offer into evidence. This is clearly not a case in which plaintiff is seeking to offer secondary evidence in the form of oral testimony and the like,[6] in which case a true question as to the existence of the original may be posed. Rather, defendants' contention is that the originals existed and were destroyed in bad faith, or still exist and are being intentionally withheld.

■ Second, whether the originals were created prior to plaintiff's access to ESB materials or following that access is of

---

**6.** Rule 1004 states no preference for any particular type of secondary evidence to prove the content of sufficiently accounted for missing originals.

little consequence when considered in light of the purpose of the "best evidence" rule. Although the "best evidence" rule is designed to facilitate the use of secondary evidence when there is a need to allow that evidence to be used in lieu of the original, the rule is also designed to keep out secondary evidence when its admission would be contrary to the furtherance of justice. A copy is always liable to error, whereas this contingency wholly disappears when the original is produced. 4 Wigmore on Evidence, § 1179 at 417. The copy may lack such features of handwriting, paper, and the like, contained in the original, and as such, deprive the opponent of the document or the trier of fact valuable means of learning legitimate objections to the significance of the document. *Id.* Rule 1004's purpose of making inadmissible secondary evidence of the content of originals which have been withheld or destroyed in bad faith should not be circumvented by plaintiff's restrictive reading of that Rule.

■ In sum, the Court finds that Rule 1004 is properly applied to this case and that plaintiff must establish the foundational requirements under that Rule by showing to the satisfaction of the Court that the originals for the AO785/2 and AO34E were lost or destroyed without bad faith.

B. *Plaintiff Must Prove that the Originals Were "More Probably than Not" Lost or Destroyed Without Bad Faith.*

It is clear that the sufficiency of the preliminary proof is addressed to the discretion of the trial judge. *See* 5 Weinstein, *supra*, § 1008[04] at 1008–12; *Willhoit v. C.I.R.*, 308 F.2d 259, 265 (9th Cir.1962); *Development Corp. of America v. United Bonding Insurance Co.*, 413 F.2d 823, 825 (5th Cir.1969). The trial judge's determination as to the standard of proof applicable will not be disturbed in the absence of clear evidence of mistake amounting to an error

of law. *Willhoit, supra*, 308 F.2d at 265; *see also, United States v. Gerhart*, 538 F.2d 807, 810 (8th Cir.1976).

Plaintiff argues that the proper standard to apply is that "whenever there is doubt, discretion is best exercised by admitting the evidence" and leaving it to the jury to evaluate the excuse for nonproduction (citing 5 Weinstein, *supra*, § 1004(01)[05] at 1004–18). Several cases, however, indicate that a stricter standard should be applied when the particular facts and circumstances warrant such an application. *See, e.g., Sylvania Electric Products, Inc. v. Flanagan*, 352 F.2d 1005 (1st Cir.1965); *Willhoit, supra*, 308 F.2d at 265. Where the missing original documents in dispute are the "very foundation of the claim," for example, more strictness in proof is required than where the writings are only involved collaterally. *Sylvania, supra*, 352 F.2d at 1008. Moreover, where any suspicion hangs over the true content of the instrument, or that it may be designedly withheld, a "more rigid" inquiry should be made into the reasons for its nonproduction. *Willhoit, supra*, 308 F.2d at 265; *see also* 4 Wigmore, *supra*, § 1194 at 439. ("[T]he moment the destruction becomes questionable at all, the inquiry is raised * * *.")

■ Under the particular facts and circumstances of this case, the Court declines to apply such a lenient standard as that advocated by plaintiff. Rather the proper standard to be applied by the Court in assessing whether or not plaintiff has satisfied the preliminary requirements of Rule 1004 is the "more probable than not" standard. Although there is some case authority for application of an even more stringent standard, under which the proponent of the evidence would have to show that there is "no reasonable probability" that the originals had been designedly withheld or suppressed,[7] this Court finds the "more probable than not" standard advocated by defendants and Judge Weinstein sufficient to

---

**7.** *Von Brimer v. Whirlpool Corp.,* 362 F.Supp. 1182, 1187 (N.D.Cal.1973), *aff'd* 536 F.2d 838

(9th Cir.1976).

vindicate the best evidence policy. *See* 5 Weinstein, *supra*, § 1008[04] at 1008–14.

■ First, the peculiar and suspicious circumstances surrounding the "discovery" and production of much of the secondary evidence in this case requires a "rigid inquiry." Second, the documents in issue here are the "very foundation" of plaintiff's claim, a claim in which plaintiff seeks to have a jury compare the similarities between plaintiff's work and defendants' work, and find the two to be "substantially" or even "strikingly" similar.[8] In making such a comparison, the importance of allowing a jury to view the plaintiff's originals for color, size, shading, line, and the like, rather than recreated, cut-and-paste, or third and fourth generation copies of those originals, is clear.

Accordingly, the applicable standard to be applied is that of "more probable than not." Under such a standard, the Court must find as a preliminary matter that it is "more probable than not" that the originals of the A0785/2 and A034E were lost or destroyed without bad faith.

### C. *This Court has Discretion to Determine Whether The Proof Meets the Relevant Standard.*

The determination of the sufficiency of the search, and in general, of the proof of the fact of loss is within the trial court's discretion. 4 Wigmore, *supra*, § 1194 at 442; *see also*, 5 Weinstein, *supra*, § 1008[04] at 1008–12. ("The court determines the standard * * * and whether the facts as it finds them show the standard was met.")

### D. *Plaintiff Has Not Established that the Originals Were Destroyed or Lost Without Bad Faith.*

■ Based upon the Court's findings of fact set forth above, the Court finds that plaintiff has not established, more probably than not, that any originals existing in 1979 and earlier were destroyed by water damage at the Boonville dome house, or were otherwise lost or destroyed without bad faith. The Court also finds, based upon the Court's findings of fact set forth above, that plaintiff has not established to the requisite degree that the original drawings existing after 1979 were destroyed or lost without bad faith.

Therefore, plaintiff has failed to satisfy the foundational requirements of Rule 1004 for admission of secondary evidence.

### E. *This Court Properly Considered All Evidence in Making its Determination.*

Rule 104(a) expressly provides that in making preliminary determinations, a court is not bound by the Rules of Evidence except those with respect to privileges. Fed.R.Evid. 104(a). Although Rule 104(a) is not an "open invitation" to ignore the Rules of Evidence, Rule 104(a) recognizes the ability of the court to receive all relevant evidence and to discount that evidence that is inherently untrustworthy or suspicious. *See* 1 Weinstein, *supra*, § 104[2] at 104–22–23 (trial judge's legal training and experience can be relied upon to winnow the "chaff from the wheat"). Therefore, under Rule 104(a), this Court was properly empowered to consider all relevant evidence in making its determination, without adhering strictly to the Rules of Evidence regarding hearsay and the like.

### F. *Secondary Evidence of the Content of the Originals is Inadmissible.*

Under Rule 1004, secondary evidence is admissible to prove the contents of the missing originals if the preliminary requirements of Rule 1004 are met. Additionally, Federal Rule of Evidence 901(a) requires all evidence to possess a requisite degree of authenticity in order to support a finding that the evidence in question is what the proponent of such evidence claims it to be. Fed.R.Evid. 901(a). As this Court has

---

**8.** In a copyright action, copying is proved by substantial similarity coupled with access. *See*

3 Nimmer, Nimmer on Copyright § 13.01[B].

found that plaintiff has not satisfied the preliminary requirements of Rule 1004, and that much of the secondary evidence plaintiff wishes to introduce lacks the requisite authenticity to justify its admission, all secondary evidence sought to prove the contents of the missing originals is inadmissible.

The foregoing constitutes the Court's findings of fact and conclusions of law. On or before October 26, 1984, counsel will file certificates of counsel setting forth the next steps to be taken in the case.